## WILLIAM SMITH *v.* HENRY GIBBON.

Where prescription had run against the mother of certain minor heirs, before her death, for more than ten years, and for more than three years against the heirs after their majority, the claim will be barred by ten years' prescription.

A suit which was voluntarily abandoned, does not interrupt prescription. C. C. 3485.

APPEAL from the District Court of St. Mary, *Overton,* J.  *W. C. Dwight,* for plaintiff.  *Henry Gibbon,* for defendant.  The judgment of the court was pronounced by

PRESTON, J.  The plaintiff brings suit for a tract of land situated and having thirty or thirty-five arpents on the east side of the river Teche, at its mouth, where it enters into Berwick's bay, with the depth that belongs to it by the titles.  There is no dispute between the parties as to the land claimed.  The plaintiff's title calls for but four hundred and fifty superficial acres, therefore, the claim in his brief, for a greater quantity, is inadmissible.  Both hold under an order of survey in favor of *Eleanor Berwick,* made by the *Baron Carrondelet,* on the 3d of July, 1797, and confirmed by the board of commissioners for the adjustment of land titles, for the western district of the territory of Orleans.

He exhibits, in evidence, an authentic act of sale from her to *John Shaw,* dated the 21st of July, 1820, made before the parish judge of the parish of St. Mary, and recorded that year, though the date of the record is not shown. *John Shaw* and his children, his wife being dead, sold the land to the plaintiff, by an authentic act dated the 18th of November, 1844.  They warranted the vendee only against themselves and heirs, and he paid but a thousand dollars for the land, showing that he was aware of the adverse claim and possession, and that he would be compelled to sue for the land.  Four months afterwards, he commenced suit for the land, but, at the trial, took a voluntary non-suit, and commenced this suit on the 25th of June, 1846.

The defendant traces his title to *Henry Johnson,* who is called in warranty. *Johnson* purchased the land from *Christopher Adams,* by an authentic act of sale passed before the parish judge of the parish of St. Landry, on the 12th, and duly recorded in the parish of St Mary, where the land was situated, on the 22d of May, 1812.

The defendants also gave, in evidence, an act of sale of the land, under private signature, from *William Newman* and his wife, *Eleanor Newman*, the grantee, dated the 5th of March, 1807, to *Leonard Claiborne*. It was acknowledged by *William Newman*, before the parish judge of the county of Attakapas, on the 14th of April, 1807, but was not recorded in the parish of St. Mary, until the year 1821. It does not appear that it was recorded in the office of a notary public, as required by the Old Civil Code, 306, art. 228, to give it effect against *bonâ fide* purchasers, previously to the act of 1813. Supposing *John Shaw* a *bonâ fide* purchaser, and nothing appears to the contrary, the title of the plaintiff might perhaps prevail, unless barred by prescription.

It is important, therefore, for us to know, whether the mark of *Eleanor Newman* to this act, is genuine or not. For, if it is her genuine act, we should require proof, of more decided acts of opposition on her part, to the possession of the defendants, to interrupt their prescription; and if counterfeited, we would not be satisfied with doubtful proof of possession by the defendants.

Besides, if it be a genuine instrument, the inquiry might arise, if it became necessary, whether the children and their vendee were not obliged by the warranties of their grandmother, there being no evidence, that their mother renounced her succession.

We are of opinion, that the cross of *Mrs Newman* to the deed of herself and husband, to *Leonard Claiborne*, dated the 5th of March, 1807, is her genuine signature. The signatures of the two witnesses to the deed, are proved to be genuine. One of them is dead; the other went to Texas; his residence is unknown, and death, probable. They are both proved to have been men of good character. One of them who wrote the deed, *F. L. Turner*, was afterwards a distinguished judge of this State, and maintained a high character for integrity, until his death.

The teste to the instrument is in these words: "In witness whereof, they (that is, *Mr. and Mrs. Newman*, the vendors,) have hereunto set their hands and seals, the day and year above written.

| Teste | | his |
|---|---|---|
| | | *William* X *Newman*, [L. S.] |
| F. L. Turner, | - | mark. |
| Luke Bryan, | | her |
| | | *Eleanor* X *Newman*. [L. S.] |
| | | mark. |

They thus witness, not that he, *William Newman*, but that they, *Mr.* and *Mrs. Newman*, have set their hands and seals to the instrument. They attested that which was false, or the instrument is genuine. Witnesses always sign after the parties to the act, or mention the particular signature they witness. It is impossible to believe, that *Turner* left this instrument, which he had drawn and attested, go out into the hands of *Claiborne*, if, it was false, to become immediately the subject of litigation and investigation at a time when it could be successfully impeached by *Christopher Bryan* and others, and with it, his integrity as a man.

The testimony of *Christopher*, that *Mrs. Newman* refused to sign the instrument, would have little weight against the defendant's testimony, which is equivalent to that of two witnesses that they saw her sign it. But he further states, that he saw the instrument with the signature of her husband and the two witnesses, and without her signature. This is not absolutely inconsistent with the genuineness of the instrument, as she might still have signed before it was deli-

vered to *Claiborne.* It is so improbable, however, that we are bound to believe, that after the lapse of forty years, this witness may be mistaken. It is more reasonable than to believe, that her other brother-in-law and another honest citizen, would have conspired with her husband and *Claiborne,* to defraud her of a tract of land in her immediate neighborhood, and that of her father, brother, relations and friends, when the fraud would, probably, be discovered immediately, and the counterfeiter might be brought to justice. *Newman,* at least, did not fear such a result, for he immediately exhibited the instrument, and acknowledged it before the judge of his county, and *Claiborne,* soon after, made the land the subject of a partnership with *C. Adams.*

It is to be obsrved too, that the name of the husband and wife are written with the same ink. When *Christopher Bryan* saw the instrument, the names of the husband and witnesses were to it, but not the wife's name. If not, it was signed afterwards, not by the husband, for he made his mark, but by a fourth counterfeiter and conspirator, to defraud the wife. This is too improbable, and the defendant's counsel has made many other suggestions, which, with the inspection of the original instrument, by consent of both parties, satisfies us, that it is genuine.

· We will now examine the pleas of prescription. *Henry Johnson* had purchased the fourth of the original concession from *Joseph Berwick,* the brother of *Mrs. Newman,* to whom it had been jointly conceded by *Baron Carrondelet,* on the 3d of October, 1811 ; and another fourth of the same concession, from *Mr. Merryman,* to whom *Joseph Berwick* had sold it. The grant had never been formally divided, and wishing to purchase the whole, *Johnson* would naturally inquire, who was the co-proprietor. *Adams* exhibited the title, which we have found to be genuine; and we have not the slightest proof from the brother *Stephen Merryman, Bryan,* or any relation of *Mrs. Newman,* that *Johnson* learned from any source, that it was suspected or that she made any claim to the land. On the 12th of May, 1812, he purchased the land in controversy, from *Adams,* by an authentic act, and had it duly recorded. He shortly afterwards had the land surveyed by *Johnson,* a surveyor of the United States, his agent pointing out the boundary of the land. It was known in the neighborhood, as the land of *Johnson.* Extracts of four assessment rolls, in 1818, 1823, 1837 and 1838, are exhibited, in which it is assessed as his land. It is rendered probable by the testimony of .*Curtis* and *Murphy,* that it was assessed in his name, for other years. He offered to sell the land in 1819 and 1821, visiting it with the intended buyer. Others proposed to buy parts of it of him. He appointed an agent near the premises, to protect, on his behalf, the cypress timber. He engaged an Indian named *Portion,* to plant date trees for him on the land. In the fall of 1819, he put *François Duval* on the land, to take care of it, who built a house and made small crops on it. *Johnson* promised to pay him for his improvements. He continued on it until the summer of 1828, when he left. But *Durand* and *Truffer* remained by the permission of *Johnson.* Being a nonresident, *Johnson* came to visit the·land, as his own, every year or two, and it was notoriously known in the neighborhood as his land. The possession of his vendee and his successors, from 1839 until the institution of this suit, in 1846, does not appear to be disputed.

Since the genuine sale to *Claiborne,* in 1807, neither *Mrs. Newman,* her heirs, or vendees, appear by the evidence, ever to have possessed an acre of the land for a day. Her husband died on another place, in 1810 or 1811. She then moved nearer to, but not on the land ; she then moved down the bay, and

further off; she then moved up near Franklin; then, two miles further up on the Teche; then, to the Indian bend, and then, to the Vermillion bayou; but never to the home given to her by the *Baron Carrondelet*, in her infancy. She sold it indeed, a second time, to her son-in-law, *John Shaw*, in 1820, by a paper title; but he too went to the Vermillion, and never to the island in dispute. As far as appears by the record, neither of them ever sent an agent to the land, or took any steps with regard to it, until the plaintiff purchased from *Shaw* and his wife's heirs, not a title, but their claim to the land.

This evidence satisfies us, that the civil possession of the land in dispute, was delivered by *Adams* to *Johnson*, in 1812, as expressed in the title, and that he held it as owner. Code, 2455. That he held it by the boundaries described in the title, and by the lines run by the surveyor in presence of his agent, in 1814. Code. 3464. That about that time, he took actual possession; that in 1819, at least, he had a corporeal possession, which continued ten years, and that, afterwards, his civil possession, at least, was continuous, uninterrupted, peaceable, public and unequivocal, until 1839;-from which time, until the commencement of this suit, the corporeal possession has been notorious, and is undisputed.

Thus, *Johnson* and his vendees have held possession, about thirty years adversely to *John Shaw* and his vendor, under a duly recorded title. The claim of *John Shaw* is therefore clearly barred by prescription. The mother of his children died in 1827, and plaintiff claimed under them, as her heirs, of one-half the property. Many legal objections might be stated to their claim. One that is manifest, is sufficient. At least seven years had elapsed, from the corporeal possession, taken by *F. Duval* of the property for *Johnson*, in the fall of 1819, before the mother's death. The youngest child became of age in April, 1842. More than three years elapsed from that date, before the institution of this suit in June, 1846, which, added to the seven, makes more than ten years' corporeal possession against majors residing in the State. The minority of the children did not, as contended by the defendant, interrupt, but only suspended the course of prescription. Code, title Prescription, chap. 3, sec. 6.

It is to be observed, that the first suit does not interrupt the prescription, because it was voluntarily abandoned. Code, art. 3485.

The judgment of the district court is affirmed, with costs.