182 So. 683

**TILLERY v. FULLER et al., and five other cases.**

**No. 34674.**

May 30, 1938.

Rehearing Denied June 27, 1938.

Supplemental Opinion July 7, 1938.

Ben E. Coleman, of Shreveport, for appellant, Mrs. Pearl Tillery.

Foster, Hall, Barret & Smith, of Shreveport, for appellants Mrs. Lelia S. Buchanan and minor, Velma Allene Lowery, and for appellants Noah S. Carter, Hope Green, Una Green Manning, and Corrine Green Manning.

Barnette & Barnette, of Shreveport, and Preston Calvert, of Grand Saline, Tex., for appellants W. R. Spearman et al.

J. Purcell Wallace, of Shreveport, Bryan, Suhr, Bering & Bell, of Houston, Tex., and Herold, Cousin & Herold, of Shreveport, for heirs of T. J. Wilson.

John B. Files, of Shreveport, for appellants J. N. Peak, Inc., O. V. Pickins, C. P. Talbot, C. W. Robinson, and John B. Files.

J. M. Grimmet, Yandell Boatner, Fred Simon, and Pugh, Grimmet & Boatner, all of Shreveport, for appellees Mrs. Minnie T. Fuller et al.

A. M. Simon and Pugh, Grimmet & Boatner, all of Shreveport, for appellee John Tyson.

Pyburn & Pyburn, of Shreveport, for appellee M. J. Derryberry.

Hunter & Hunter, of Shreveport, for appellee James A. Hunter.

Wilkinson, Lewis & Wilkinson, of Shreveport, amicus curiæ.

Coleman & Morgan, of Shreveport, for plaintiff-appellant.

Lewell C. Butler, of Shreveport, for petitioners.

O'NIELL, Chief Justice.

These cases are petitory actions. They were consolidated and tried as one suit because each suit is for a fractional interest in either all or a part of the same tract of land. The land has an area of 240 acres, is composed of the S.½ of S.E.¼ of Section 11, N.½ of N.E.¼ of Section 14, and W.½ of N.W.¼ of Section 13, in T. 23 N., R. 16 W., and is in the Rodessa oil field, in Caddo parish.

For an understanding of the relative positions of the three 80-acre tracts we must have in mind that the three sections are regular sections, in place, so that Section 11 is on the north side and Section 13 on the east side of Section 14.

The defendants, in possession of the land, are Mrs. Minnie Tyson Fuller, John Tyson,

the Estate of N. S. Tyson, and a corporation called J. N. Peak, Inc. N. S. Tyson died after the suits were filed, and his executors are defending his interest in the suits. Mrs. Minnie Tyson Fuller is in possession as owner of the 80 acres described as W.½ of N.W.¼ of Section 13.; John Tyson is in possession as owner of the 40 acres described as N.W.¼ of N.E.¼ of Section 14; the Estate of N. S. Tyson is in possession as owner of the 80 acres described as S.E.¼ of S.E.¼ of Section 11 and N.E.¼ of N.E.¼ of Section 14; and J. N. Peak, Inc., is in possession as owner of the 40 acres described as S.W.¼ of S.E.¼ of Section 11.

The claims of all parties to the litigation are traced back to a sale made by one Nathan Hoss to Mrs. Dempsey Susan Spearman, née Adams, then the wife of Samuel W. Spearman, on the 3rd of December, 1867. The tract of land that Mrs. Spearman bought from Hoss had an area of 360 acres, embracing not only the 240 acres now in contest but also the adjacent 120 acres on the west, described as S.E.¼ of S.W.¼ of Section 11 and N.½ of N. W.¼ of Section 14. Mrs. Spearman sold this 120-acre tract to Travis H. Spearman on the 18th of March, 1879; hence that part of Mrs. Spearman's purchase is not in contest in these suits.

The plaintiffs in all of the suits, except in the two suits in which Ralph Thatcher Wilson and his brothers and sister are the plaintiffs, claim title by inheritance from Samuel W. Spearman and Dempsey Susan Spearman, deceased, or from one or the other of them, and also from their daughter, Mrs. Lucy Spearman Wilson, who, having survived her parents, died intestate and without a descendant heir. The plaintiffs in the two suits of Ralph Thatcher Wilson and his brothers and sister are the heirs of Thomas J. Wilson, and claim a half interest in the 240 acres of land by virtue of a tax sale made to him on the 27th of September, 1890, under an assessment in the name of the Taylor Manufacturing Company. The company bought the half interest in the land from William B. Spearman on the 5th of July, 1886; and he, in turn, claimed title for a fourth interest by virtue of a deed from Mrs. Fannie Spearman Smith, dated March 16, 1885, and claimed title for the other fourth interest by virtue of a deed from Mrs. Elizabeth Spearman Matthews, dated October 16, 1885. There is a dispute about the extent of the fractional interest conveyed by these deeds; but that has nothing to do with the question of validity or invalidity of the tax title claimed by the heirs of Thomas J. Wilson, because the assessment was in the name of the record owner. Mrs. Smith and Mrs. Matthews were two of the four surviving heirs of Mrs. Dempsey Susan Spearman, issue of her marriage with Samuel W. Spearman.

Samuel W. Spearman was married twice. His first wife was Lucy Ann Taylor. She died September 11, 1856, survived by four sons, issue of her marriage with Samuel W. Spearman, namely, (1) William B. Spearman, (2) Samuel G. Spearman, (3) George R. Spearman, and (4) Travis H. Spearman. Samuel W. Spearman married Dempsey Susan Adams on the 9th of June, 1857. She died March 7, 1881, survived

by four daughters, issue of her marriage with Samuel W. Spearman, namely, (1) Nancy Lilla Spearman, who married Noah Tyson; (2) Elizabeth Rede Spearman, who married Dr. J. D. Matthews; (3) Fannie May Spearman, who married Thomas Smith; and (4) Lucy Ella Spearman, who married Thomas J. Wilson.

One important question in the case is whether the sale made by Nathan Hoss to Mrs. Dempsey Susan Spearman vested the title to the property in her, separately, or in the matrimonial community between her and Samuel W. Spearman. If the property belonged to Mrs. Spearman alone, each one of her four daughters inherited a fourth interest in it. If it was community property, each daughter inherited only three-sixteenths interest, and each one of the four sons of Samuel W. Spearman inherited one-sixteenth interest in the property. The plaintiffs in all of the suits of the Spearman heirs claim that the property was community property. The defendants, heirs of Noah Tyson, claim that it was the separate property of Mrs. Dempsey Susan Spearman. It was not stated in the deed that the price paid for the property,—which was declared in the deed to be "nine hundred dollars specie cash in hand paid",—was the separate fund of Mrs. Spearman, or that the property was to be her separate property. Hence the presumption is that the property became community property, even though the title was taken in the name of the wife. Rev.Civ.Code, art. 2402. The judge of the district court found that the evidence offered by the defendants to overcome the presumption that the property was community property was not sufficient. We have come to the same conclusion. Some evidence was introduced by the defendants to show that the mother of Dempsey Susan Adams established a trust fund for her children, in South Carolina. But the evidence indicates that, if that occurred, it was fifteen years before Mrs. Dempsey Susan Spearman bought the land now in contest. There is no evidence that Mrs. Dempsey Susan Spearman received any money from a trust estate in South Carolina, or from any other source. The evidence, therefore, goes no further than to show that it is possible that Mrs. Spearman had a separate fund of $900 or more when she bought the land from Nathan Hoss. On the other hand, there is in evidence here a certified copy of a deed showing that Samuel W. Spearman sold a farm in South Carolina, for $4,617 cash, on the 12th of October, 1866; which was about the time when he moved to Louisiana, and was a year and nearly two months previous to the buying of the land in contest in these suits. It is as likely that the $900 which was paid for this land came out of this $4,617, as that it came from a trust fund belonging to Mrs. Spearman in South Carolina. There is evidence to the effect that Mr. and Mrs. Spearman and their children looked upon the land which she bought as being her separate estate. But that merely indicates that they knew nothing about the community laws of Louisiana. On the other hand, in instances when it was important for Samuel W. Spearman to say whether the land was community property or the separate property of his wife, he declared that it was community property.

We refer, for example, to his recording of a homestead declaration, to exempt the property from liability for debts that might be incurred by him, and to his having the property inventoried as community property when he qualified as tutor for his minor children. It is argued that evidence of that kind is objectionable either as hearsay evidence or as a self-serving declaration. Our opinion, however, is that the objection to such evidence, like family traditions, refers more to the sufficiency or effect of the evidence than to its admissibility, in cases where there was no motive for fabrication. To rebut the presumption that property bought in the name of a married woman becomes the property of the matrimonial community unless it is stipulated in the deed that the price paid was her separate fund, requires a preponderance of evidence that the price paid for the property was the wife's separate fund under her administration. Rev.Civ.Code, arts. 2402, 2405; Stauffer, Macready & Co. v. Morgan, 39 La.Ann. 632, 2 So. 98; Succession of McMahon, 176 La. 63, 145 So. 269; Houghton v. Hall, 177 La. 237, 148 So. 37; Succession of Ipser, 180 La. 656, 157 So. 380. The evidence does not rebut the presumption in this case.

Samuel W. Spearman came from South Carolina to Louisiana with his wife and children in or about the year 1866, and resided on a plantation near the land which Mrs. Spearman afterwards bought from Nathan Hoss. Then the family took up their residence in a two-story house on that part of the land now in contest described as the SW¼ of NW¼ of Section 13. The major part of the area which Mrs. Spear-

man bought was woodland. The area that the Spearmans cultivated was the land surrounding the residence, being the major part of the SW¼ of NW¼ of Section 13, and extending into the NW¼ of the same quarter-section, and also an area of about fifty acres extending over the southern part of the SE¼ of SE¼ of Section 11, the major part of the NE¼ of NE¼ of Section 14, and into the NW¼ of NW¼ of Section 13. All of the sons of Samuel W. Spearman married and moved away from the family home, and established their homes on neighboring farms, before their father died. The four daughters also were married before their father died. Nancy and her husband, Noah Tyson, first moved to a farm about a mile east from the family home, but soon afterwards moved to the adjoining 80-acre tract, called the S. M. Tyson place, being the NE¼ of NW¼ and NW¼ of NE¼ of Section 13. S. M. Tyson was a son of Noah Tyson and his first wife, Ida Bozeman. There were two sons of that marriage, the other son being John Tyson, who is one of the defendants in these suits. Elizabeth Spearman Matthews, who married Dr. J. D. Matthews, continued to live in the home of her father until he died. Then she went to the home of her sister, Mrs. Noah Tyson, and resided there until the year 1888, when Mr. and Mrs. Tyson moved back into the old two-story residence where her father died. Mrs. Fannie Spearman Smith and her husband, Thomas Smith, lived on a farm near Kiblah, Arkansas, about eight miles from the old Spearman home. Lucy Spearman Wilson and her husband, Thomas J. Wilson, lived in Atlanta, Texas, about seventeen miles from

the old Spearman home. Mrs. Wilson died June 11, 1889, intestate and without a descendant heir. A child was born to her on July 22, 1888, but the child died on November 2, that year. Whatever interest Mrs. Wilson had in the estate of either of her parents, therefore, was transmitted to her sisters and half brothers, and to the surviving child of the one who had died.

On March 16, 1885, Mrs. Fannie Spearman Smith sold what she called a fourth interest in the 240 acres of land to her half-brother, William B. Spearman; and on 'October 16, of the same year, Mrs. Elizabeth Spearman Matthews sold what she called a fourth interest in the land to William B. Spearman. On July 5, 1886, William B. Spearman sold the half interest in the land to the Taylor Manufacturing Company. Thereafter, the half interest in the 240 acres of land was assessed to the Taylor Manufacturing Company, and, on September 27, 1890, was sold by the tax collector to Thomas J. Wilson for delinquent taxes. Wilson's name was written "Thomas L. Wilson" in the tax deed, but there is no doubt that the writing of the initial "L", instead of "J", was a clerical error, and that the Wilson who bought the half interest in the land was Thomas J. Wilson. He had married Lucy Spearman and was residing in Atlanta, Texas. She had died during the previous year. He married Elizabeth Foster on November 12, 1898. The plaintiffs in the suit entitled Ralph Thatcher Wilson et al. v. N. S. Tyson et al., and in the suit entitled Ralph Thatcher Wilson et al. v. J. N. Peak, Inc., et al., are the three sons and the daughter of Thomas J. Wilson and his second wife, Elizabeth Foster,—namely,

Norman Foster Wilson, Thomas Woodrow Wilson, Ralph Thatcher Wilson (an emancipated minor), and Mrs. Clarice Wilson Davis.

Mrs. Nancy Spearman Tyson, wife of Noah Tyson, died at the old Spearman residence on March 3, 1891, survived by her three children, namely, W. H. Tyson, N. S. Tyson, and Mrs. Minnie Tyson Fuller.

On June 23, 1900, Noah Tyson bought at a tax sale, under an assessment in the name of T. J. Wilson, a half interest in 160 acres of land which was described on the assessment roll and in the tax deed as the S½ of SE¼ and N½ of SE¼ of Section 14, T. 23, R. 16. It is contended by the defendants, heirs of Noah Tyson, that this description was merely an incorrect description of the tract of 160 acres forming the S½ of SE¼ of Section 11 and N½ of NE¼ of Section 14, because T. J. Wilson owned that tract of 160 acres, but did not own any part of the SE¼ of Section 14.

On July 15, 1911, Noah Tyson bought at a tax sale, under an assessment in the name of T. J. Wilson, a half interest in 240 acres of land described as S½ of SE¼ of Section 13, N½ of NE¼ of Section 14, and W½ of NW¼ of Section 13, T. 23, R. 16. That is an accurate description of the 240 acres of land now in contest, except that the description in the tax deed calls for S½ of SE¼ of Section 13, instead of the S½ of SE¼ of Section 11. It is contended by the defendants, heirs of Noah Tyson, that the number "13", in the tax deed, is merely a clerical error, intended for the number "11", because the 240 acres of land which T. J. Wilson bought at the tax sale in 1890 included

the S½ of SE¼ of Section 11; and Wilson did not own or claim the S½ of SE¼ of Section 13, or the S½ of SE¼ of any other section except Section 11.

Noah Tyson died on November 10, 1923, leaving as his heirs at law the two sons of his first marriage, namely, S. M. Tyson and John Tyson, and the two sons and daughter of the second marriage, namely, N. S. Tyson, W. H. Tyson and Mrs. Minnie Tyson Fuller, who was then a widow. It appears that Noah Tyson had bought, or otherwise acquired, the tract of 160 acres adjacent to and on the east side of the old Spearman tract of 240 acres, now in dispute. It appears also that, of this tract of 160 acres, Noah Tyson sold the north half, being the 80 acres described as NE¼ of NW¼ and NW¼ of NE¼ of Section 13, to his son, S. M. Tyson, and sold the southern half, being the 80 acres described as SE¼ of NW¼ and SW¼ of NE¼ of the same section, to his son, John Tyson.

The heirs of Noah Tyson and of his wife, Nancy Spearman Tyson, accepted their successions unconditionally; and, for some undisclosed reason, they included as the property of the succession of Noah Tyson and his second wife the whole tract of 400 acres, being the 240 acres now in contest and the two 80-acre tracts said to have been sold by Noah Tyson to S. M. Tyson and John Tyson, respectively. On the 10th of May, 1924, the five heirs of Noah Tyson obtained an ex parte judgment of the district court declaring that they were the only heirs of Noah Tyson and his wife, Nancy Spearman Tyson, and hence that each of them, namely, S. M. Tyson, John Tyson, N. S. Tyson, W.

H. Tyson, and Mrs. Minnie Tyson Fuller, inherited a fifth interest in the 400 acres of land, described in the judgment. It seems that whoever attended to the proceedings did not know, or overlooked the fact, that two of the sons of Noah Tyson, namely, S. M. Tyson and John Tyson, were not heirs of the second wife, Nancy Spearman Tyson. That mistake, however, is not important now, because the five heirs of Noah Tyson, being of the age of majority, and being the only persons interested in any part of the 400 acres of land, had the right to apportion it among themselves as they saw fit; and, accordingly, on the 11th of June, 1924, they all signed a notarial act of partition, in which they declared that they were the joint owners, each owning one-fifth, of the 400 acres of land, which they described in the act, and that they thereby divided it among them, thus: S. M. Tyson accepted as his share the 80 acres described as the NE¼ of NW¼ and NW¼ of NE¼ of Section 13; John Tyson accepted as his share the 80 acres described as the SW¼ of SE¼ of Section 11 and NW¼ of NE¼ of Section 14; N. S. Tyson accepted as his share the 80 acres described as SE¼ of SE¼ of Section 11 and NE¼ of NE¼ of Section 14; Mrs. Minnie Tyson Fuller accepted as her share the 80 acres described as the W½ of NW¼ of Section 13; and W. H. Tyson accepted as his share the 80 acres described as the SE¼ of NW¼ and SW¼ of NE¼ of Section 13. The 80 acres allotted to S. M. Tyson and the 80 acres allotted to W. H. Tyson are not in contest in this suit, because they are not a part of the tract of land that was bought by Mrs. Dempsey Susan Spearman from Nathan Hoss.

On the 3rd of October, 1872, Mrs. Dempsey Susan Spearman sold to a man named Maryon Lawton, for $120 cash, the 20 acres of land described as the N½ of the NW¼ of NW¼ of Section 13, in T. 23 N., R. 16 W. That is the northern 20 acres of the 80-acre tract that was allotted to Mrs. Minnie Tyson Fuller in the act of partition on June 11, 1924. Samuel W. Spearman did not sign the deed to authorize his wife to make the sale to Lawton; but the judge of the district court found that Samuel W. Spearman afterwards formally acknowledged or recognized that his wife had sold the 20 acres to Lawton. Hence the judge sustained the defendants' plea that there was an outstanding title to the 20 acres, in which the plaintiffs in these suits had no interest. Maryon Lawton built a home on the 20-acre tract and lived there for about ten years. The house was only about a quarter of a mile north from the two-story residence of Samuel W. Spearman and his wife. Lawton abandoned the 20 acres of land in or about the year 1885. He has never since claimed the property; and none of the plaintiffs in these suits is claiming title through or under Maryon Lawton. In 1901, N. S. Tyson married, and after he and his wife had resided for about two years with his parents, in the two-story house on the SW¼ of NW¼ of Section 13, N. S. Tyson and his wife took possession of the 20 acres of land which Lawton had abandoned. After N. S. Tyson and his wife had lived on the Lawton tract about a year they built and moved into a residence on the NE¼ of NE¼ of Section 14; where the family was yet residing at the time of the trial of these suits. The house is on the southern half of the 80-acre tract that was allotted to N. S. Tyson in the act of partition on June 11, 1924.

John Tyson sold the 40 acres described as SW¼ of SE¼ of Section 11 to J. N. Peak on the 27th of June, 1929, and Peak sold the land to J. N. Peak, Inc., on the 21st of April, 1932. John Tyson continued residing upon and cultivating the NW¼ of NE¼ of Section 14 up to the time of the trial of these suits.

The old two-story house occupied by Noah Tyson and his children was destroyed by fire in 1903; after which he built another residence on the same 40-acre tract, and resided there with his family until Mrs. Minnie Tyson Fuller and W. H. Tyson moved to other homes. At the same time when Noah Tyson built the new residence he built also a house for tenants, on the same 40-acre tract. From the time that Noah Tyson and his wife returned to the old Spearman home, soon after her father's death, some of the members of the Tyson family have been in possession of the property continuously, cultivating the fields and clearing the woodland; and no one ever questioned their right of possession before the first of these suits was filed—forty-seven years after Noah Tyson and his wife had gone into possession of the property. What brought on the litigation was the discovery of oil at Rodessa, in July of 1935, and the consequent attempt of certain parties seeking leases or mineral rights to "perfect" the Tysons' title for the 240 acres of land, by obtaining quitclaims from the absent heirs of Samuel W. Spearman and Dempsey Susan Spearman, and of their daughter, Mrs. Lucy Spearman Wilson.

The first suit to be filed was the one entitled Pearl Smith Tillery v. Minnie Tyson Fuller et al.—filed September 3, 1935. Mrs. Tillery is the daughter and only heir of Mrs. Fannie Spearman Smith. Mrs. Tillery claims 3/28 interest in the 240 acres of land. She contends that the land belonged to the matrimonial community between her grandparents, Samuel W. Spearman and Dempsey Susan Spearman. Hence Mrs. Tillery claims that her mother inherited 1/8 interest in the land from her mother, Dempsey Susan Spearman, and inherited 1/16 interest from her father, Samuel W. Spearman. Mrs. Tillery contends that, in the act of sale by her mother to William B. Spearman, on March 16, 1885, the interest which was described and transferred was not one-fourth of the 240 acres of land, but one-fourth of the half interest belonging to Dempsey Susan Spearman's estate, in the 240 acres of land. Mrs. Tillery's interpretation of the description in the deed is that her mother sold only 1/8 and hence retained 1/16 interest in the land. Mrs. Tillery, therefore, claims that she, Mrs. Tillery, inherited that 1/16 interest and that she inherited by representation of her deceased mother, from the latter's sister, Mrs. Lucy Spearman Wilson, 5/112 interest in the 240 acres of land. The 1/16 interest (or 7/112) plus the 5/112 interest makes the 12/112, or 3/28 interest, claimed by Mrs. Tillery in this suit. Her calculation that she inherited 5/112 interest in the land from her aunt, Lucy Spearman Wilson, is mathematically correct. According to article 912 of the Civil Code, the estate of a person who dies without a descendant heir, and who is not survived by either parent, is inherited by his or her brothers and sisters, or their descendants; and, according to article 913, if there are half brothers or half sisters, and brothers or sisters of the full blood, the estate is divided equally between the paternal and maternal lines, so that the half brothers and sisters of the deceased share only in one-half of the estate, and the brothers and sisters of the full blood share in both halves. Therefore, in the distribution of Mrs. Lucy Spearman Wilson's 3/16 interest in the estate of her parents, Mrs. Tillery inherited, by representation of her mother, 1/3 of 3/32 interest, plus 1/7 of 3/32 interest, or a total of 5/112 interest, in the estate of Samuel W. Spearman and Dempsey Susan Spearman. But our interpretation of the description in the act of sale made by Mrs. Tillery's mother to William B. Spearman is that Mrs. Tillery's mother intended to sell one-fourth interest in the 240 acres of land, believing that the land belonged entirely to the estate of her mother, Dempsey Susan Spearman. The description in the deed reads thus: "the undivided one fourth of the Estate of Demcey Spearman (deceased) the following described property, to-wit: North half of Northeast quarter of Section (14) fourteen, the West half of Northwest quarter of section (13) thirteen and the South half of Southeast quarter of Section (11) eleven, all of [in] Township (23) twenty-three and of Range (16) Sixteen, containing (240) two hundred and forty acres, more or less, with all improvements thereon." The term "the Estate of Demcey [meaning Dempsey] Spearman" meant merely the property which was thereafter described, and of which Mrs. Smith meant to sell "the undivided one fourth". It is necessary to in-

tercalate some such word or words as "being", or "which is", between the expression, "The Estate of Demcey Spearman (deceased)", and the expression, "the following described property", in order to follow the Scotchman's rule—to make sense. Without some such intercalation—either actual or imaginary—the expression, "the undivided one fourth of the Estate of Demcey Spearman (deceased) the following described property", etc., would not make sense. The same style of expression was employed in the sale made by Mrs. Elizabeth Spearman Matthews to William B. Spearman, on October 16, 1885. The description in that deed reads thus: "the undivided one fourth of the Estate of Demcey Spearman (deceased) the North half of the Northeast quarter of Section (14) fourteen", etc. There is no doubt that the seller and the buyer, in both of these sales, intended to describe the undivided one-fourth of the 240 acres of land, which land they believed belonged entirely to the Estate of Dempsey Susan Spearman, deceased, because the title stood in her name. In the deed by which William B. Spearman sold to the Taylor Manufacturing Company, on July 5, 1886, the interest which he had bought from Mrs. Smith and Mrs. Matthews, he left no doubt that he meant to sell the half interest in the 240 acres of land, because he described it thus: "the undivided (½) half of the Estate of Mrs. Demcey S. Spearman, *being* the North (½) half of the Northeast (¼) quarter of Section (14) fourteen", etc. We have italicized the word "being", because that is the word that was omitted inadvertently from the description in the two deeds by which William B. Spearman bought the undivided half which he

sold to the Taylor Manufacturing Company—of the 240 acres of land—which he thought had constituted the estate of Dempsey Susan Spearman. All three deeds were written by the same notary public. His calling the 240 acres of land the estate of Dempsey S. Spearman signifies merely that he and the parties to the deeds did not concern themselves with the community laws, but looked only to the fact that the title to the land stood in Mrs. Spearman's name.

The deed from Mrs. Smith to William B. Spearman did not in fact convey a fourth interest in the estate of her parents, but conveyed only three-sixteenths interest, because, like Mrs. Matthews' interest, Mrs. Smith's interest in the estate of her parents was only three-sixteenths interest. William B. Spearman owned a sixteenth interest in the land by inheritance from his father—although William B. Spearman apparently overlooked his inherited interest in the land. After he had bought the interest of Mrs. Smith and that of Mrs. Matthews, and when he sold what he thought was a half interest to the Taylor Manufacturing Company, he really owned—and therefore sold—only seven-sixteenths interest in the land.

Our conclusion on this subject, therefore, is that Mrs. Tillery did not inherit any interest in this property from her mother.

On the other hand, the 5/112 interest which Mrs. Tillery inherited from her aunt, Lucy Spearman Wilson, is not impaired or affected by the fact that Mrs. Tillery's mother gave a warranty deed to William B. Spearman for a greater interest in the property than Mrs. Tillery's mother owned. Mrs. Wilson was living when Mrs.

Tillery's mother gave the warranty deed to William B. Spearman for a fourth interest in the land. Hence it is not legally possible for the 5/112 interest which was afterwards transmitted to Mrs. Tillery, by the death of Mrs. Wilson, to be affected by the warranty obligation of Mrs. Tillery's mother. The facts of this case do not bring it within the rule that an heir who accepts a succession unconditionally thereby assumes the warranty obligations of the deceased. The Civil Code, in terms, forbids the making of a sale or any stipulation or agreement to affect the succession of a living person. Rev.Civ.Code, arts. 2454, 1887. Mrs. Tillery did not inherit the 5/112 interest in the property from her mother, but inherited it directly from her aunt, Lucy Spearman Wilson, by representation of Mrs. Tillery's mother. Mrs. Tillery might have renounced the succession of her mother without forfeiting the right to represent her in the succession of her mother's sister. Rev.Civ. Code, art. 900. Hence there is no theory on which Mrs. Tillery's inheritance from Mrs. Wilson, of 5/112 interest in this property, should be taken as a contribution to the fulfillment of an obligation on the part of Mrs. Tillery's mother to warrant the title for the fourth interest in this property for which Mrs. Tillery's mother gave a warranty deed to William B. Spearman.

Mrs. Tillery, in the suit which she filed, averred that her mother was not of the age of majority when she made the sale to William B. Spearman; hence Mrs. Tillery, in her petition, expressly reserved the right to sue to annul the sale. A mere reservation of an intention to sue, of course, does not present any issue for the court to decide. But, afterwards, Mrs. Tillery filed a petition of intervention in each of the two suits of Ralph Thatcher Wilson and others, in which Mrs. Tillery asked to have the sale by her mother to William B. Spearman annulled on the ground that her mother was a minor when she signed the deed. The question of validity or invalidity of the tax title claimed by Ralph Thatcher Wilson and his brothers and sister does not depend upon the validity of the title that William B. Spearman acquired from Mrs. Tillery's mother, or upon the validity of the title that William B. Spearman conveyed to the Taylor Manufacturing Company. The fact that the title for a half interest in the property stood on record in the name of the Taylor Manufacturing Company was sufficient to make the tax sale of the half interest, under an assessment in the name of the company, a valid sale, after the lapse of three years from and after the adoption of the Constitution of 1898. According to Section 2 of Act No. 140 of 1890, an assessment "in the name of the person whom the conveyance records show to be the owner" is a valid assessment. That statute was not in effect when the assessment was made to the Taylor Manufacturing Company, under which the tax sale was made to Thomas J. Wilson—under the provisions of Act No. 85 of 1888. But it is well settled that, under the provision of article 233 of the Constitution of 1898—retained in section 11 of article 10 of the Constitution of 1921—a sale for taxes is not subject to annulment on the ground that the sale was made under an assessment to one who was not the owner of the property, unless the suit for annulment is brought within three years

from the date of the recording of the tax deed. Therefore, after the Constitution of 1898 had been in force three years, the tax sale to Thomas J. Wilson was not subject to annulment on the ground that the Taylor Manufacturing Company, in whose name the half interest in the property was assessed, had not a valid title to the half interest in the property. Ashley Co. v. Bradford, 109 La. 641, 33 So. 634.

■ Aside from this limitation of three years, and even if the title to the half interest in this property had not passed from the Taylor Manufacturing Company by virtue of a tax sale, an action on the part of Mrs. Tillery to annul the sale made by her mother to William B. Spearman would be barred by the prescription of five years, under article 3542 of the Civil Code, and, if not barred by the prescription of five years, it would be barred by the prescription of ten years, under article 2221 of the Civil Code. Brownson v. Weeks, 47 La.Ann. 1042, 17 So. 489; Munholland v. Fakes, 111 La. 931, 35 So. 983; Hamilton v. Hamilton, 130 La. 302, 57 So. 935; Weathersby v. Springfield Lumber Co., 141 La. 577, 75 So. 416. Mrs. Tillery's mother was yet a minor when she died; but Mrs. Tillery was more than ten years beyond the age of twenty-one when she filed her suit, and when she intervened in the suit filed by the heirs of Thomas J. Wilson.

The defendants, heirs of Noah Tyson, plead, in defense of the suit of Mrs. Tillery—and in defense of the three other suits in which the plaintiffs claim title by inheritance from Samuel W. Spearman or Dempsey Susan Spearman or Lucy Spearman Wilson—first, the prescription of ten years, acquirendi causa, under articles 3478 and 3515 of the Civil Code, second, the prescription of thirty years, acquirendi causa, under articles 3499 and 3515, and third, the prescription of thirty years under articles 1030, 1305, and 3548 of the Civil Code. In the alternative, the defendants plead that, if the claim of any one of these plaintiffs is not barred by prescription, then that, as to such claim, the 20-acre tract described as N½ of NW¼ of NW¼ of Section 13 is eliminated from the contest by the outstanding title of Maryon Lawton, in which the plaintiffs have no interest, and which they have not attacked. And, again in the alternative, the defendants plead that, if the claim of any one of the plaintiffs in these four suits is not barred by the prescription of ten or thirty years, then that any such claim is reduced one-half by the tax title which Noah Tyson acquired by virtue of the tax sale dated June 23, 1900, and the tax sale dated July 15, 1911. And, in support of the latter plea, the defendants plead the limitation of three years (now five years) under article 233 of the Constitution of 1898 and the Constitution of 1913, and section 11 of article 10 of the Constitution of 1921.

The defendants concede, of course, that, according to article 3479, in order to have acquired title by the prescription of ten years acquirendi causa, they must have possessed the property under a deed apparently sufficient to transfer the owner-

ship of the property. Article 3515 of the Code merely provides that a person who has possessed as owner an entire estate, with a valid title for only a half interest in it, may acquire the other half interest by the prescription of thirty years—or by the prescription of ten years if he has possessed in good faith and under a deed purporting to have transferred the entire ownership to him. The defendants in this case base their plea of prescription of ten years, first, upon the act of partition dated June 11, 1924, and, second, upon the tax sale to Noah Tyson dated July 15, 1911, as far as the half interest in the 160 acres forming the N½ of NE¼ of Section 14 and the W½ of NW¼ of Section 13 is concerned.

■ An act of partition cannot support a plea of prescription of ten years, acquirendi causa, because such an act does not purport to transfer the title to the property, but is merely declaratory of the fact that the title is vested in the parties to the transaction. Kernan v. Baham, 45 La.Ann. 799, 13 So. 155; People's Bank of New Orleans v. David, 49 La.Ann. 136, 140, 21 So. 174; Pearce v. Ford, 124 La. 851, 50 So. 771. The defendants do not deny that the law has been so stated with regard to an act of partition, but they deny that the act dated June 11, 1924, purporting to be an act of partition, was in fact an act of partition. They contend that the effect of the transaction was to transfer the title, particularly as to the 80-acre tract that was allotted to John Tyson, because, up to the time of the transaction, he and S. M. Tyson each

owned a separate tract of 80 acres, which they put into the transaction. A sufficient answer to the argument is that, whatever may have been the effect of the transaction, it was on its face an ordinary act of partition, in which the parties declared that they owned the whole 400 acres of land in indivision, each owning a fifth interest in it. Hence the act on its face did not transfer the ownership of the property, but was only declaratory of the ownership.

Whether the tax sale dated July 15, 1911, is a sufficient basis for the prescription of ten years acquirendi causa, for a half interest in the 160 acres of land forming the N½ of NE¼ of Section 14 and the W½ of NW¼ of Section 13, as described in the tax deed, is a question which we need not consider unless we find that the tax title itself is not valid.

■ The evidence of the defendants' actual possession of the 240 acres of land is hardly sufficient to sustain the plea of prescription of 30 years, acquirendi causa, under articles 3499 and 3515 of the Civil Code, because the fences that surrounded the land—particularly the woodland—were allowed to decay, and, in some instances, to disappear, after a local law or ordinance went into effect, forbidding the owners of cattle to allow them to run at large. This plea of prescription of 30 years, acquirendi causa, however, is not a necessary defense to these suits if the plea of prescription of 30 years under article 1030, or under article 1305, is applicable to the facts of the case, because the prescription of 30 years under any of these articles of the Code is sus-

pended during the minority of any person against whom it might be pleaded. Tyler v. Lewis, 143 La. 229, 78 So. 477. The judge of the district court held that the prescription of 30 years under article 1030 of the Code was a bar to all of these suits except that of the minor child, Velma Allene Lowery, as to whom the prescription was suspended during her minority. If this prescription is applicable to these suits, there is no plaintiff here whose suit might be barred by the prescription of thirty years acquirendi causa, under article 3499, unless his suit is barred also by the prescription of thirty years under article 1030 of the Civil Code. We refer now, of course, to the four suits in which the plaintiffs claim title by inheritance from the Spearmans. We shall dispose of the claims of the plaintiffs in these suits before considering the tax titles involved in the two suits of Ralph Thatcher Wilson et al.

Articles 1030 and 1305 of the Civil Code are both appropriate to the facts of this case. Article 1030 is the one by which the right of an heir to elect whether he will accept or renounce a succession becomes barred by prescription if he fails to exercise or assert the right within thirty years. Article 1305 declares that, if one of the heirs to a succession has possessed separately either all or a part of the estate continuously for thirty years, or, if each one of the coheirs has possessed separately a part of the estate continuously for thirty years, he or they can successfully oppose a suit for a partition of the estate. And article 3548 declares that all actions for immovable property, *or for an entire estate, as a succession,* are barred by the prescription of thirty years.

Up to the time when this court decided the case of Generes v. Bowie Lumber Co., 143 La. 811, 79 So. 413, there was some doubt about the meaning of article 1030 of the Civil Code. The doubt was as to the conditions under which the right of an heir to *accept* the succession would be barred by his silence for thirty years, and the conditions under which the right of an heir to *renounce* the succession would be barred by his silence for thirty years. In the Generes Case the court considered the question very thoroughly and gave a definite meaning to the article of the Code. The soundness of that decision was challenged in Bendernagel v. Foret, 145 La. 115, 81 So. 869; and there again the court considered with great care the genesis of the article, in the adoption of the Civil Code of 1825, the recommendations of the Code Commission, the other newly adopted articles on the same subject, and the opinions of the French commentators on the provisions in the Civil Code of France, on this subject; and the court adhered to the opinion rendered in the Generes Case. These decisions were quoted with approval in Dew v. Hammett, 150 La. 1094, 91 So. 523, and in the Succession of Tyson, 186 La. 516, 172 So. 772. The difficulty that was presented was in the reconciling of article 1030 of the Code with article 1014, declaring that he who is called to a succession, being seized thereof in right, is considered the heir so long as he does not manifest an intention of divesting him-

self of that right, and article 1017, declaring that the renunciation of a succession is never presumed. What the court held in the cases referred to—particularly in Bendernagel v. Foret—was that an heir at law, or a regular heir, and particularly a forced heir, would not lose his right to accept the succession, by failing to accept it within thirty years, as against a trespasser, or a stranger in possession without a title and without the benefit of the prescription acquirendi causa. Hence we held that it was only as to a coheir who had accepted the succession, or an heir next in degree, who had accepted the succession, that the one who failed to accept within the thirty years would lose his right to accept the succession, by effect of the prescription provided for in article 1030 of the Civil Code. In Bendernagel v. Foret, 145 La. 115, at pages 128, 129, 81 So. 869, at page 874, we quoted from the treatise of Fuzier-Herman, vol. 2, p. 91, No. 17 and No. 22, on article 789 of the Civil Code of France; and we stated the result, thus:

"In other words, as to a coheir who has accepted the succession, or as to the heir next in degree who has accepted, the heir at law who has not accepted becomes a stranger to the succession at the end of 30 years. But, as to a mere possessor without title and without the benefit of prescription acquirendi causa, the heir at law, who is invested with seizin, or the right of possession, by mere operation of the law and without having to manifest an intention to accept the succession, does not lose his right to accept by failing to exercise it within 30 years. * * * What the heir at law stands to lose by the prescription of 30 years (except, of course, as to his coheirs or heirs next in degree who have accepted) is the right to renounce the succession. Our ruling in Generes v. Bowie Lumber Co., in that respect, is consistent with the dissertation of Fuzier-Herman, vol. 2, p. 91, particularly comment No. 22; and what was said on the subject in Harang v. Golden Ranch Land & Drainage Co. [143 La. 982, 79 So. 768] (on rehearing) is precisely in accord with the French author."

In Harang v. Golden Ranch Land & Drainage Co., Chief Justice Provosty, who was a French scholar, explained the effect of article 1030 of the Civil Code—being article 789 of the Civil Code of France— in such cases, thus (page 788):

"By not accepting the succession within 30 years the heir loses his inheritance, and the heir next in rank becomes vested with the right of inheritance; and this happens even though this heir next in rank has not been in possession of the property of which the succession is composed. Defendant points to this as illustrative of the possibility of an owner losing his property by the prescription of 30 years without possession on the part of the person to whom he loses it. The inappropriateness of the illustration lies in the fact that, under the express terms of said article, what is barred by the prescription which it provides is not the right of an owner to recover his property, but, in the words of the article, 'the faculty of accepting a succession.' * * * The heir has 30 years within which he may elect to accept, and thereby acquire the property.

* * * The rationale of said article 1030 is that the public has an interest in not letting the ownership of property remain too long in uncertainty or suspense; and hence a time is fixed within which the heir must make up his mind whether to accept or renounce, and thereby fix the ownership of the property. How totally inapplicable this is to the case of an owner losing his ownership because he has had no occasion to use it for a certain length of time is perfectly evident. We may add that no article in the French Code or in ours has been found to be more difficult of interpretation than this article 1030 [789 in the Code Napoleon]. The French writers have evolved no less than eight different systems, or theories, out of it; and the justices of this court, in the Succession of Waters, 12 La.Ann. 97, frankly confessed their inability to solve it."

It is argued by counsel for the plaintiffs in one of these cases that the decision rendered in Schreiber v. Beer's Widow & Heirs, 150 La. 676, 91 So. 149, on rehearing, was a modification of the doctrine of Generes v. Bowie Lumber Company and Bendernagel v. Foret; but we find that both of these cases were cited with approval in the Schreiber Case. The decision in the latter case had reference only to a matter of procedure. What was decided was that Schreiber had no right of action against the widow and heirs of Beer, to revive a judgment for $20,000 which had been rendered against him, without Schreiber's first proceeding against the widow and heirs in the method prescribed in article 1055 of the Civil Code, and articles 977 and 979 of the

Code of Practice, to compel the widow and heirs to elect whether they would accept or renounce the succession of Beer. But the court took occasion to say, in the course of the opinion, that the ruling on the method of procedure was not a departure from the doctrine of the Generes Case and the Bendernagel Case, on the substantive law.

The facts which we have related, describing the disintegrating of the Spearman family after the death of its head and master, leaves no doubt that Mrs. Nancy Spearman Tyson, mother of the defendants in these suits, was the only one of the heirs who accepted the succession of her parents, and the succession of her sister, Mrs. Lucy Spearman Wilson. Mrs. Fannie Spearman Smith accepted the succession of her mother by selling to William B. Spearman her interest in the land which she described as the estate of her mother, on March 16, 1885; and Mrs. Elizabeth Spearman Matthews accepted the succession of her mother by selling to William B. Spearman her interest in the land which she described as the estate of her mother, on October 16, 1885. The other daughter of Mrs. Dempsey Susan Spearman, namely, Mrs. Lucy Spearman Wilson, having survived her parents, died at the age of 23 years, 5 months and 6 days, without having accepted the succession of either of her parents. And none of the collateral heirs of Mrs. Wilson ever accepted her succession before the institution of these suits, except the sister, Nancy Spearman Tyson, who remained in possession of the estate until she died, and whose sons and daughter—and their transferees—have remained in possession ever since. We concur in the opinion of the

judge of the district court, therefore, that, as against Mrs. Nancy Spearman Tyson and her sons and daughter—and their transferees—the rights of the coheirs with Mrs. Tyson, to accept the succession of their parents or the succession of Mrs. Lucy Spearman Wilson, were barred by the prescription of thirty years under article 1030 of the Civil Code when these suits were filed, unless, in any particular instance, the prescription may have been suspended long enough by the minority of an heir of any one of Mrs. Tyson's sisters or half brothers.

■■ When the prescription of thirty years is suspended by the death of the heir against whom it is running, and by his leaving a minor heir, the thirty years period does not begin anew when the minor arrives at the age of majority, but merely resumes its course where it left off, and has to go only the remaining part of the thirty years to reach its end. See Tyler v. Lewis, 143 La. 229, 78 So. 477, citing with approval Smith v. Gibbon, 6 La.Ann. 684, 687, where the rule was applied to the ten-year prescription, as the law on the subject was in 1851. Referring to that case, in Tyler v. Lewis, it was said (page 481):

"There [in Smith v. Gibbon] the prescription of 10 years acquirendi causa was pleaded against a plaintiff who had been of age only 3 years and had derived title by inheritance from her mother, during whose lifetime the defendant had held adverse possession more than 7 years. It was held that, as the prescription that was running against the plaintiff's mother was only suspended, not interrupted, by the plaintiff's minority, it resumed its original course when the

plaintiff attained the age of majority and had then only three years to run. The doctrine of the decision is that prescription must begin its term anew if it has been interrupted [as by an abandonment of possession of the property], but not if it has been merely suspended, after having commenced its term."

That decision is in accord with article 944 of the Civil Code; the purport of which is that, if an heir dies, intestate, and without having accepted the succession that has fallen to him, he transmits to his heirs his interest in the succession of the one from whom he inherited, but with only such right as he had to accept the succession. That was explained in the Succession of Coco, 185 La. 901, 913, 171 So. 70, 74, thus:

"Article 944 of the Civil Code provides: 'The heir being considered as having succeeded to the deceased from the instant of his death, the first effect of this right is that the heir transmits the succession to his own heirs, with the right of accepting or renouncing, although he himself have not accepted it, and even in case he was ignorant that the succession was opened in his favor.'

"All that the provisions of the codal article mean is, that as the ownership of the property of the succession is vested in the heir directly and immediately upon the death of the deceased, *subject to his right to accept or renounce it,* in the event the heir himself should die before exercising the right, he transmits to his own heir, either as the whole or as only a part of his own succession the property acquired by him by inheritance, *with the same privilege*

*of accepting or renouncing which he enjoyed."* (The italics are ours.)

Mrs. Dempsey Susan Spearman had been dead 54½ years when the first of these suits—the suit of Mrs. Pearl Smith Tillery —was filed. Samuel W. Spearman had been dead 50 years and 8 months; and Mrs. Lucy Spearman Wilson had been dead 46 years.

We have found that Mrs. Tillery did not inherit any interest in the 240 acres of land from her mother, because the latter sold her interest in the land to William B. Spearman on the 16th of March, 1885. We have, found, however, that Mrs. Tillery did inherit, by representation of her mother, 5/12 interest in the land, from Mrs. Lucy Spearman Wilson, who had inherited ⅛ interest from her mother, Dempsey Susan Spearman, and 1/16 interest from her father, Samuel B. Spearman. The only remaining question in Mrs. Tillery's case, therefore, is whether her right to the 5/12 interest in the land was barred by the prescription of thirty years at the time when she filed her suit. She was born on the 30th of May, 1885, and was therefore 29 years and 3 months and 5 days past the age of twenty-one years when she filed her suit. But the record shows that Mrs. Lucy Spearman Wilson was born on the 5th of January, 1866, and died on the 11th of June, 1889, and hence was 2 years and 5 months and 6 days past the age of twenty-one years when she died. Add to the 2 years and 5 months and 6 days, of the prescriptive period, which had run against the right of Mrs. Wilson to accept the succession of her parents, the 29 years and 3 months and 5 days, which ran against the right of Mrs. Tillery to accept the succession of Mrs. Wilson, and the total period is 31 years and 8 months and 11 days. There was introduced in evidence in this case a photograph of the tombstone marking Mrs. Wilson's grave, in the cemetery at Atlanta, Texas. The photograph shows that the dates carved on the tombstone are: "born April 4, 1868 —died June 11, 1889." It is conceded that June 11, 1889, is the date on which Mrs. Wilson died; hence if she was born on April 4, 1868, she would have lived only 2 months and 7 days beyond the age of twenty-one years; and Mrs. Tillery's right to accept her share of the inheritance of Mrs. Wilson in the succession of the latter's parents would not be barred by prescription. But the record in the family Bible, of the birth of each one of Samuel W. Spearman's fourteen sons and daughters (six of whom died very young), shows that Lucy Ella Spearman was born January 5, 1866. As proof of the date of birth of a deceased person, the record in a family Bible, being very likely a contemporaneous writing, is more reliable perhaps than the inscription on the tombstone. In this case the accuracy of the record in the Bible is confirmed by the testimony on the subject, and by the fact that the record of the birth of Lucy Ella Spearman is written immediately above the record of the birth of her sister, Fannie May Spearman, born May 5, 1867. According to the testimony Fannie May was the child born next after Lucy Ella Spearman. After this case was submitted for decision the attorney for Mrs. Tillery and the attorneys for the defendants signed and filed in the record an agreement

that the record in the family Bible, that Lucy Ella Spearman was born on January 5, 1866, was correct. In the written agreement, however, the date shown on the photograph of the tombstone was referred to as April 4, 1866—instead of April 4, 1868. We have some doubt as to whether this is a typographical error in the written agreement, or whether the agreement was made under a false impression of the date on the photograph of the tombstone. Hence we decide for ourselves that the record in the Bible, that Lucy Ella Spearman was born on January 5, 1866, is correct. Mrs. Tillery's suit, therefore, is barred by the prescription of 30 years.

The suit entitled W. R. Spearman et al. v. J. N. Peak, Inc., et al. was filed on the 16th of September, 1935. The plaintiffs are the heirs of George R. Spearman, who died in February, 1928. The plaintiffs are two sons, W. R. and S. B. Spearman, and a daughter, Mrs. Jewell C. Bensen, and five grandchildren of the late George R. Spearman, namely, T. G. Dalton, Mrs. Lyle Dalton Greer, Mrs. Anice Dalton Ogden, Mrs. Clarice Dalton Heflin, and Miss Virginia Dalton, children of a deceased daughter of George R. Spearman, namely, Mrs. Nettie Spearman Dalton. The plaintiffs aver that George R. Spearman inherited $\frac{1}{16}$ interest in the 240 acres of land from his father, Samuel W. Spearman, and inherited from his sister, Lucy Spearman Wilson, $\frac{1}{7}$ of $\frac{1}{2}$ of her $\frac{3}{16}$ interest, making a total of $\frac{17}{224}$ interest, which, the plaintiffs claim, was transmitted to them in the following proportions, viz.: To each of the two sons and the daughter of George R. Spearman $\frac{17}{896}$, and to each

of the five grandchildren $\frac{17}{4480}$. About two months before this suit was filed, each one of the parties who are the plaintiffs in this suit, except Mrs. Lyle Dalton Greer, signed a quitclaim for whatever interest he or she might have in the 240 acres of land, in favor of the parties who are the defendants in this suit. It appears that the quitclaims were obtained by N. S. Tyson, in company with an agent for a corporation holding or about to acquire a mineral lease on the land. It appears that the agent for the corporation paid $25 cash to each of the signers of the quitclaims. The plaintiffs in this suit seek to annul the quitclaims on the ground that they were obtained by misrepresentation of their rights. We find it unnecessary to decide upon the validity of the quitclaims, because we have concluded that the right of George R. Spearman to accept the succession of his father or of his sister was barred by the prescription of 30 years under article 1030 of the Civil Code. George R. Spearman was 77 years and 8 months of age when he died. He was past 34 years of age when his father died; and a period exceeding 43 years elapsed between that date and the date of the death of George R. Spearman. A period of 38 years and 8 months elapsed between the date of the death of Mrs. Lucy Spearman Wilson and the date of the death of George R. Spearman. Hence the judge of the district court was right in rejecting the demands of the heirs of George R. Spearman.

The suit entitled Lelia Spearman Buchanan et al. v. Minnie Tyson Fuller et al. was filed February 14, 1936. The plaintiffs are two of the three heirs of the

late Travis H. Spearman, namely, Mrs. Lelia Spearman Buchanan, a daughter, and Velma Allene Lowery, a granddaughter, of the late Travis H. Spearman. Velma Allene Lowery is the minor child of Mrs. Velma Spearman Lowery, a daughter of the late Travis H. Spearman. Mrs. Lowery died in 1935—long after her father died. Each of the plaintiffs claims $17/672$ interest in the 240 acres of land. The minor child is represented by Mrs. Buchanan as tutrix. Travis H. Spearman inherited $1/16$ interest in the land from his father, Samuel W. Spearman, and inherited $3/224$ interest from his sister, Lucy Spearman Wilson, making a total interest of $17/224$ interest; hence each of his three heirs inherited $17/672$ interest in the land. The only question is whether the claim of the plaintiffs, or of either of them, is barred by the prescription of 30 years under article 1030 of the Civil Code. Travis H. Spearman was born August 30, 1856, and therefore arrived at the age of majority on August 30, 1877. He died March 24, 1894. His father died December 27, 1884, and Mrs. Wilson died June 11, 1889. Hence, when Travis H. Spearman died, his heirs, if of age, had 20 years and 9 months and 3 days in which to accept his $1/8$ interest in his father's succession (or $1/16$ interest in the land), and had 22 years and 9 months and 11 days in which to accept Travis H. Spearman's $1/7$ of $1/2$ of his sister's $9/16$ interest in the succession of her parents, or $3/224$ interest in the land. Mrs. Buchanan was born October 28, 1887, and hence became 21 years of age on October 28, 1908. She filed her suit on February 14, 1936, having allowed 27 years and 3 months and 16 days to elapse without accepting her father's succession, or his interest in the succession of his father or of his sister; which 27 years and 3 months and 16 days was more time than was left to Mrs. Buchanan,—even for the acceptance of her father's interest in the succession of his sister. We therefore affirm the judgment of the district court rejecting the demand of Mrs. Buchanan. Her demand as tutrix for the minor child, Velma Allene Lowery, however, presents a different case. The child's mother, Velma Spearman, was born June 12, 1892, and therefore arrived at the age of majority on June 12, 1913. She died on February 11, 1935, leaving, as her only heir, the daughter, Velma Allene Lowery, who was born October 30, 1924, and who is therefore yet a minor child. As Mrs. Velma Spearman Lowery lived 21 years and 7 months and 29 days after she became 21 years of age, the period of prescription of 30 years was completed as to her right to accept her father's interest in his father's succession. Hence the claim of the child is barred to the extent of $1/3$ of her grandfather's $1/8$ interest in the succession of his father—or as to the $1/48$ interest in the land. But, as to the child's $1/3$ interest in the $3/224$ interest which her grandfather inherited from his sister, Lucy Spearman Wilson, the child's mother had 22 years and 9 months and 11 days from the time she arrived at the age of majority, in which to accept her $1/3$ interest in the $3/224$ interest which her father had inherited from his sister, and only 21 years and 7 months and 29 days of that time had expired when the prescription became suspended by the death of the child's mother. Hence the minor child, Velma Allene

Lowery, is entitled to $\frac{1}{224}$ interest in the land in contest. The judge of the district court gave the child a judgment for $\frac{1}{336}$ interest in the land, on the theory that, although the prescription of 30 years ran against Mrs. Lucy Spearman Wilson from the date on which she became 21 years of age as to her $\frac{1}{8}$ interest in the succession of her father, the prescription did not run against her, even after she became 21 years of age, as to her $\frac{1}{4}$ interest in the succession of her mother, because her father opened the succession of her mother and qualified as the tutor of her children. Notwithstanding the great respect which we have for the opinion of the judge of the district court, we are not so sure that the 30-years prescription against the right of Mrs. Wilson to accept the succession of her mother did not commence to accrue when Mrs. Wilson arrived at the age of 21 years. We have concluded that the prescription did begin to accrue against Mrs. Wilson when she became 21 years of age. Hence we have charged against the period which the law allowed Travis H. Spearman in which to accept the succession of Mrs. Wilson—and against the period which in turn the law allowed Mrs. Velma Spearman Lowery in which to accept the succession of her father—the 2 years and 5 months and 6 days which elapsed between the date on which Mrs. Wilson arrived at the age of 21 years and the date of her death. But, if we should hold that this period of 2 years and 5 months and 6 days of prescription did not accrue against Mrs. Wilson, the result is that, from the time when Mrs. Velma Spearman Lowery arrived at the age of 21 years, she had 25 years and 2 months and 17 days in which to accept her father's inheritance of $\frac{1}{7}$ of $\frac{1}{2}$ of his sister's inheritance of $\frac{9}{16}$ interest in the succession of her parents, or $\frac{9}{224}$ interest in the land. Mrs. Lowery died 21 years and 7 months and 29 days after arriving at the age of 21 years; which period exceeded the time allowed for Mrs. Lowery to accept her father's inheritance from his father, but was within the time allowed for Mrs. Lowery to accept her father's inheritance from his sister, Lucy Spearman Wilson—whether we do or do not charge up to Mrs. Lowery the 2 years and 5 months and 6 days which elapsed between the date on which Mrs. Wilson arrived at the age of 21 years and the date of her death. Our conclusion, therefore, is that the judgment which declares the minor child, Velma Allene Lowery, to be the owner of $\frac{1}{336}$ interest in the land in contest should be amended so as to increase the fraction to $\frac{1}{224}$ interest in the land in contest, excepting the Lawton 20 acres.

The judge of the district court excluded from the land in which he allowed Velma Allene Lowery the $\frac{1}{336}$ interest the 20 acres that Mrs. Dempsey Susan Spearman sold to Maryon Lawton on October 3rd, 1872. The judge held that, although the sale was not valid originally, because Mrs. Spearman did not have authority from her husband to make the sale, it was rendered valid by her husband's ratifying it when he opened the succession of his wife and qualified as tutor for her minor children. The ratification was made by Spearman's admission that the 20 acres had been sold to Lawton and hence should

be excluded from the inventory of the property belonging to the matrimonial community. Spearman, of course, had the right to ratify the sale as far as his half interest in the 20 acres of land was concerned. To that extent the ratification was valid, and Spearman could not have annulled the sale thereafter. But, as to the half interest which the four daughters had inherited from their mother, their father had no right to ratify the sale after the death of his wife. The sale was null because the property belonged to the community, and the wife had no right to sell it. The interest which the minor child, Velma Allene Lowery, inherited from her mother was inherited by the latter from her father, Travis H. Spearman, and by him from his sister, Lucy Spearman Wilson. But, as far as the Lawton 20 acres is concerned, Lucy Spearman Wilson did not inherit the $\frac{1}{16}$ interest— or any interest—from her father, Samuel W. Spearman, but inherited only the $\frac{1}{8}$ interest from her mother, Dempsey Susan Spearman. The consequence is that Miss Velma Allene Lowery inherited only $\frac{1}{336}$ interest in the Lawton 20 acres, and inherited the $\frac{1}{224}$ interest in the remaining 220 acres of land. These fractions are subject to reduction if we conclude that the tax sale to Thomas J. Wilson, in 1890, or the tax sales to Noah Tyson, in 1900 and 1911, of a half interest in the 240 acres of land, had the effect of reducing the claims of the Spearman heirs, as plaintiffs in these suits.

The suit entitled Noah S. Carter et al. v. Minnie Tyson Fuller et al. was filed on the 16th of May, 1936. The plaintiffs are four grandchildren of William B. Spearman, namely, Noah S. Carter, Hope Green, Mrs. Una Green Manning, and Mrs. Corinne Green Manning. Noah S. Carter is a son of Mrs. Tincie Spearman Carter, who was a daughter of William B. Spearman. She died on June 6, 1933. Hope Green and Mrs. Una Green Manning and Mrs. Corinne Green Manning are the daughters of Mrs. Emma Spearman Green, who was a daughter of William B. Spearman. She died in August, 1933. The plaintiffs claim $\frac{459}{17920}$ interest in the 240 acres of land. It is not necessary to go over the calculation of which this fraction is the result. It is sufficient to say that the plaintiffs claim that each of them inherited a share, not only of the $\frac{3}{224}$ interest which their grandfather inherited from his sister, Lucy Spearman Wilson, but also of the $\frac{1}{16}$ interest which their grandfather inherited from his father, Samuel W. Spearman. As to that $\frac{1}{16}$ interest, it ought to be sufficient to say that Samuel W. Spearman died before William B. Spearman sold to the Taylor Manufacturing Company, by warranty deed, $\frac{1}{2}$ interest in the 240 acres of land when in fact he owned only $\frac{7}{16}$ interest in the land. Aside from this, the claims of the plaintiffs are barred by the prescription of 30 years, under article 1030 of the Civil Code—not only with regard to the $\frac{1}{16}$ interest which William B. Spearman inherited from his father, but also with regard to the $\frac{3}{224}$ interest which he inherited from his sister, Lucy Spearman Wilson. He died at the age of 69, on the 16th of July, 1917; which was more than 32 years after his father died, and more than 26 years after Mrs. Wilson died. He was survived by his daughters, Mrs. Tincie Spearman Carter

and Mrs. Emma Spearman Green, both of whom died in 1933. And, judging from the date of their mother's death, as stated in the petition in this suit, Mrs. Carter and Mrs. Green were past 21 years of age when their father died.

The two suits of the heirs of Thomas J. Wilson, founded upon the tax sale to their father, dated September 27, 1890, were filed on the 9th of November, 1935. The suits are alike, except that in the suit against N. S. Tyson, John Tyson and Mrs. Minnie Tyson Fuller, the plaintiffs are claiming a half interest in the S.E.¼ of S.E.¼ of Section 11, N.½ of N.E.¼ of Section 14, and W.½ of N.W.¼ of Section 13; whereas, in the suit against J. N. Peak, Inc., the plaintiffs are claiming a half interest in the S.W.¼ of S.E.¼ of Section 11. The two suits, therefore, embrace a half interest in all of the 240 acres of land in contest in the four other suits. In the suit against the three Tysons, four other individuals claiming interests in the mineral rights are made defendants; and, in the suit against J. N. Peak, Inc., five other individuals claiming interests in the mineral rights are made defendants.

The plaintiffs, in their petition, anticipated that the defendants would set up, as a muniment of title, a tax sale dated June 23, 1900, by which Noah Tyson claimed to have acquired from Thomas J. Wilson a half interest in the land in contest, and especially the 160 acres of land described as S.½ of S.E.¼ of Section 11 and N.½ of N.E.¼ of Section 14, and that the defendants would set up also as a muniment of title a tax sale dated July 10, 1911, by which Noah Tyson claimed to have acquired from Thomas J. Wilson a half interest in the W.½ of N.W.¼ of Section 13, and to have acquired also a half interest in the 160 acres forming the S.½ of S.E.¼ of Section 11 and N.½ of N.W.¼ of Section 14, if in fact he had not acquired a title to the half interest in that tract by the tax sale dated June 23, 1900. The plaintiffs pleaded that the tax sales made in 1900 and 1911 were null, on the ground of previous payment of the taxes for which the property was sold, and on the further ground that there was a verbal agreement between Thomas J. Wilson and Noah Tyson, the effect of which was that Tyson was obliged to pay the taxes for Wilson. The defendants, in their answer, did set up, as an alternative plea, that, if Thomas J. Wilson acquired title to a half interest in the 240 acres of land by the tax sale in 1890, then Noah Tyson acquired the half interest from Wilson by the tax sales of 1900 and 1911. The judge of the district court held that the tax sale to Wilson, in 1890, was null, as to all of the land except the so-called Lawton 20 acres, on the ground that the taxes for the year 1889 were paid on all but the Lawton 20 acres, before the date of the tax sale, under an assessment in the name of the Succession of Dempsey Susan Spearman, thus: "D. S. Spearman Succession 220 acres of land bot. of Hoss & Spearman." In refusing to grant a new trial, the judge said that, if the tax sale to Wilson, in 1890, was good for the Lawton 20 acres, then the tax sale from Wilson to Noah Tyson, in 1911, transferred the title for the Lawton 20 acres to Noah Tyson. Hence the judge rejected the demands of the plaintiffs.

The tax sale made to Wilson in 1890 is in due form, and calls for a half interest in the 240 acres of land, accurately described in the assessment and in the tax deed, as described in the recorded sale to the Taylor Manufacturing Company. The only error in the tax deed is that the name of the buyer is given as Thomas L. Wilson. But the proof is positive—and it is not now denied—that the individual to whom the sale was made was Thomas J. Wilson, the father of the plaintiffs in these suits. The only ground on which the sale might be pronounced null is the ground on which the judge of the district court pronounced it null; that is, that the taxes for which the half interest in the land was sold were paid previous to the sale, under the assessment in the name of D. S. Spearman's Succession. And, even for that cause, the sale of the so-called Lawton 20 acres could not be annulled. The reason for that is the Lawton 20 acres was, obviously, omitted from the assessment in the name of D. S. Spearman's Succession. We assume—as the judge of the district court assumed—that the assessment, "D. S. Spearman Succession 220 acres of land bot. of Hoss & Spearman", was intended to be an assessment of the remaining 220 acres of the 360 acres which Mrs. Dempsey Susan Spearman bought from Nathan Hoss, and of which she sold 20 acres to Maryon Lawton on the 3rd of October, 1872, and 120 acres to Travis Spearman on the 18th of March, 1879.

In article 233 of the Constitution of 1898, and in the corresponding article of the Constitution of 1913, it was declared that no sale of property for taxes should be set aside for any cause, except on proof of dual assessment, or of payment of the taxes for which the property was sold prior to the date of the sale—unless the proceeding to annul the sale was instituted within three years from the date of the recording of the tax sale. But, in the Constitution of 1921, in article 10, section 11, "dual assessment" was omitted from the exceptions to the causes for which a tax sale could not be annulled after three years. Hence, since the Constitution of 1921 has been in effect, a tax sale has been protected by the limitation of three years, against a suit to annul the sale on the ground of dual assessment—the only exception to the rule that a tax sale shall not be annulled for any cause after three years being the case where the taxes for which the property was sold were paid before the sale was made. Another important change was made in the law on this subject in adopting section 11 of article 10 of the Constitution of 1921. This provision, which was not in article 233 of the Constitution of 1898 or of 1913, was added: "The fact that taxes were paid on a part of the property sold, prior to the sale thereof, or that part thereof was not subject to taxation, shall not be cause for annulling the sale as to any part thereof on which the taxes for which it was sold were due and unpaid," etc. Under the Constitution of 1898 and the Constitution of 1913, this court had held, in several decisions, that a tax sale was entirely null if any part of the taxes for which the property was sold were paid previous to the sale, or if any part of the property sold was not subject to taxation.

By a constitutional amendment adopted in November, 1932, pursuant of a joint resolution which became Act No. 147 of 1932, section 11 of article 10 of the Constitution was amended by increasing the period of limitation from three to five years. But that amendment does not affect this case, because the Constitution of 1921 had been in effect longer than three years —in fact eleven years—when the amendment was adopted.

The plaintiffs; heirs of Thomas J. Wilson, deny that there was a sufficient description in the assessment of the 220 acres of land to the Succession of D. S. Spearman, in 1889, to identify the land as being a part of that of which a half interest belonged to the Taylor Manufacturing Company. But, considering that the area is exactly the same as the only tract of land that the succession of Dempsey Susan Spearman owned, and that the land assessed was referred to as having been bought from Hoss, we agree with the judge of the district court that there was a dual assessment, in 1899, of all of the 240 acres of land except the Lawton 20 acres. Therefore, if a suit to annul the tax sale had been brought at any time before the Constitution of 1921 went into effect, the suit would not have been barred by the limitation of three years. The only question in the present suits, however, is whether the taxes were paid under the dual assessment; that is, under the assessment of the 220 acres of land to the Succession of D. S. Spearman. There is no evidence, one way or the other, as to whether the taxes under that assessment were paid. The copy of the assessment roll that belonged in the office of the tax collector—which copy would show whether the taxes were paid—could not be found. The judge of the district court presumed that the taxes assessed to the Succession of D. S. [Dempsey Susan] Spearman were paid, on the theory that, if they had not been paid, the tax collector, in the performance of his duty, would have sold the property under that assessment. The attorneys for the heirs of Wilson argue that, inasmuch as the dual assessment affected only a half interest in the property, it was not the duty of the tax collector to sell the 220 acres assessed entirely to the Succession of D. S. Spearman. It was the duty of the tax collector to correct the error, by collecting the taxes on only a half interest in the 220 acres assessed to the Succession of D. S. Spearman. The other half interest in the land belonged to, and was properly assessed to, the Taylor Manufacturing Company—according to the public records. If the tax collector did his duty, and if the heirs of Dempsey Susan Spearman did their duty, with regard to the taxes assessed to the Succession of D. S. Spearman in 1889, the tax collector corrected the error, or avoided an unfair consequence of the error, by collecting half of the taxes so assessed—which was the same as collecting the taxes on a half interest in the property. If that was done no taxes were paid on the dual assessment of a half interest in the 220 acres of land, and all of the taxes were collected that were owed on the land. Whatever may have been done, or left undone, by the tax collector, in that respect, there

is no presumption that the taxes assessed against the 220 acres of land, in the name of the Succession of D. S. Spearman, in 1889, were paid in full. Hence there is no cause for annulling the tax sale to Wilson for the 220 acres of land.

■ The question to be decided, therefore, is whether the tax sales to Noah Tyson, in 1900 and 1911, or either of these sales, conveyed a valid title from Thomas J. Wilson to Noah Tyson. Taking up first the tax sale dated June 23, 1900, we find the evidence sufficient to identify the 160 acres of land, of which a half interest was sold to Tyson, as being the S½ of SE¼ of Section 11 and N½ of NE¼ of Section 14, in T. 23 N., R. 16 W. The identification is made certain by retracing the series of errors made by the assessor in describing the property on his rolls, from the year 1890, in which year Wilson bought the half interest in the land under a correct description, to the year 1899, for the taxes of which year Noah Tyson bought the half interest under the assessment to Wilson. Although the half interest in the property was sold to Wilson in 1890, the assessor assessed it to the Taylor Manufacturing Company for that year, describing it accurately, thus: "Taylor Manufacturing Company—Undivided ½ interest in S½ of SE¼ of Sec. 11, W½ of NW¼ of Sec. 13, N½ of NE¼ Sec. 14, T. 23, R. 16." The taxes for which the property was so assessed were paid on November 19, 1890—presumably by or for Thomas J. Wilson. In 1891 the land was assessed to T. L. Wilson—the letter "J" being written with a pencil over the letter "L", which is in ink. The land was described thus: "½ interest in S½ of SE¼ of S. 11

and W½ of NE¼ S. 13 and N½ of NE¼ of S. 14, T. 23, R. 16." The assessment roll bears the notation "Paid 1/13/93." The only error in the assessment was in the describing of the W½ of NW¼ of Section 13 as the W½ of NE¼ of the section. The W½ of the NE¼ of the section, of course, is detached from the other 160-acre tract described in the assessment, and did not ever belong to Wilson or to the Taylor Manufacturing Company. Notwithstanding the describing of the W½ of NW¼ of section 13 as the W½ of NE¼ of Section 13, no one would have had any doubt about identifying the 240 acres of land described in the assessment as being that which was correctly described in the tax sale to Wilson in 1890. The same error that was made in the assessment to Wilson in 1891 was repeated in 1892, 1893 and 1894; and, on the assessment roll for the latter year, the assessor made a ring around "W½ of NE¼ S. 13", with a pencil, and connected it with a notation, thus: "dup. to Noah Tyson." That, evidently, meant that there was a duplicate assessment of that 80-acre tract to Noah Tyson. The assessor noted also that the name was "T. J. Wilson", and made a pencil memorandum showing that when the taxes were paid, 2/20/95, a deduction of one-third of the amount of the taxes was allowed on account of the duplicate assessment of one of the three 80-acre tracts. In the assessment of the land to Wilson for the next year, 1895, the assessor, having observed that the W½ of NE¼ of Sec. 13 was assessed to Noah Tyson, and overlooking the fact that the assessment of this 80-acre tract to Wilson was intended for the W½ of NW¼ of Sec. 13, undertook to correct the

error by omitting the W½ of NE¼ of Sec. 13 from the assessment to Wilson. The same error was made in the assessment to Wilson in 1896, 1897, 1898 and 1899. The consequence was that there was no assessment of the W½ of NW¼ of Section 13 to Wilson in any of these years, under either a correct or an incorrect description. In the assessment to Wilson in 1898 the assessor made another error, in that he described the N½ of NE¼ of Section 14 as the N½ of the SE¼ of the section, and made the assessment thus: "80 A.—½ interest in S½ of SE¼ Sec. 11, N½ of SE¼ of 14, 23–16." In the name T. L. Wilson, which was written in ink, the initial "J" was written beside the "L". The 80 acres, evidently, represented the undivided half of 160 acres; which demonstrates that there was no assessment to Wilson of the W½ of NW¼ of Section 13 in 1899. In the assessment to Wilson in 1899 the assessor made the additional error of omitting the figure "11" after the subdivision "S½ of SE¼". Hence he wrote the description thus: "80 A—½ interest in S½ of SE¼, N½ of SE¼, Sec. 14, 23–16." That was an unusual and a roundabout way of describing the whole SE¼ of the section, and hence would have caused any reader to look for an error in the description; and the error would have been disclosed immediately by a retracing of the previous assessments of the land to Wilson, and by reference to the tax sale to him. According to the conveyance records of Caddo Parish, there was no land title on record as belonging to Thomas J. Wilson, or T. J. Wilson; and the only title recorded in the name of T. L. Wilson was the tax title for the half interest in the 240 acres of land now in contest, which includes the S½ of SE¼ of Section 11 and N½ of NE¼ of Section 14. In the defective description, in the assessment of the land to Wilson, for the taxes of 1899, the correct number of the township and of the range was given, and the number of one of the three sections (section 14), in which was located the land belonging to Wilson and intended to be assessed, was also given correctly. Hence hardly any evidence outside of the assessment rolls was needed to obtain an exact description of the land intended to be assessed. It is true that the 80 acres forming the W½ of NW¼ of Section 13 was omitted from the assessments of 1895, 1896, 1897, 1898 and 1899.; and it is obvious, from the notation made on the assessment for 1894, that the omission was made intentionally, though under a misunderstanding, on the part of the assessor. Hence, in the tax sale of the property assessed to T. L. Wilson, or T. J. Wilson, for the taxes of 1899, the tax collector could not have given a title to the W½ of NW¼ of Section 13, not even a title that would be protected by the limitation of three years; for it is well settled that, if a sale made by a tax collector and purporting to be a sale for delinquent taxes is not preceded by any assessment at all of the property intended to be assessed, the sale is absolutely null—and, being not really a tax sale, cannot be made valid by the limitation of three years. Guillory v. Elms, 126 La. 560, 52 So. 767; Morton v. Xeter Realty, 129 La. 775, 56 So. 883; Brock v. E. McIlhenny's Son, 136 La. 903, 67 So. 951; Mecom v. Graves, 148 La. 369, 86 So. 917; Board of Commissioners v. Concordia Land & Tim-

ber Co., 149 La. 1053, 90 So. 402; Hollingsworth v. Schanland, 155 La. 825, 99 So. 613; Progressive Realty Co. v. Levenberg, 177 La. 749, 149 So. 444; Kees v. Louisiana Central Lumber Co., 183 La. 111, 162 So. 817.

▮▮▮ Adverting now to the half interest in the 160 acres of land described as S½ of SE¼ of Section 11 and N½ of NE¼ of Section 14, T. 23 N., R. 16 W.— described in the assessment to Wilson in 1899 as "½ interest in S½ of SE¼, N½ of SE¼, Sec. 14, 23–16"—we have concluded that the tax sale to Noah Tyson in 1900, for the 160 acres of land belonging to Wilson and forming the S½ of SE¼ of Section 11 and N½ of NE¼ of Section 14, was not subject to annulment on the ground of the error in the description of the land after the lapse of three years from the date of the recording of the tax deed. A tax sale made under an assessment in which the description of the property intended to be assessed is erroneous is not for that reason invalid if the assessment was made in the name of the owner of the property intended to be assessed and if the description in the assessment is such that the property intended to be assessed can be reasonably identified. Act No. 140 of 1890, Sec. 3, p. 180; Hollingsworth v. Poindexter, 156 La. 621, 100 So. 790; Nebraska-Tensas Co. v. Moritz, 157 La. 174, 102 So. 195. A tax sale made under an assessment in which the description of the property intended to be assessed is so defective that resort must be had to evidence outside of the assessment roll in order to identify the property intended to be assessed is protected by the limitation of three years if the assessment

was made in the name of the true owner, or owner of record, of the property intended to be assessed, and if the identity of the property intended to be assessed is established unmistakably by such outside evidence. Close v. Rowan, 171 La. 263, 130 So. 350; Gayle v. Slicer, 188 La. 940, 178 So. 498. In such cases the identification of the property intended to be assessed may be confirmed by proof that the party in whose name the property was assessed did not own any other property in the section or other subdivision given in the assessment. Weber's Heirs v. Martinez, 125 La. 663, 51 So. 679; In re Perrault's Estate, 128 La. 453, 54 So. 939; Vannetta v. Busbey, 131 La. 681, 60 So. 76; Landry v. McWilliams, 135 La. 655, 65 So. 875; Pierson v. Castell Land & Harbor Co., 159 La. 158, 105 So. 274; Close v. Rowan, 171 La. 263, 130 So. 350; Gayle v. Slicer, 188 La. 940, 178 So. 498. It is true that Wilson owned, in addition to the half interest in the S½ of SE¼ of Section 11 and N½ of NE¼ of Section 14, a half interest also in the W½ of NW¼ of Section 13, which was described erroneously in the assessments for the years 1891 to 1894, and was omitted from the assessments for the subsequent years; but the facts which we have related leave no doubt that the W½ of NW¼ of Section 13 was not one of the two 80-acre tracts intended to be described in the assessment for 1899, under which the tax sale was made to Noah Tyson.

The plaintiffs contend that the tax sale to Noah Tyson in 1900 was null as to the SW¼ of SE¼ of Section 11, because the assessment rolls for the year 1899 show that the W½ of SE¼ of that section was as-

sessed to a man named James B. Terry, and that he paid the taxes so assessed on December 1, 1899. A photostatic copy of the assessment roll for 1899, showing the assessment in the name of James B. Terry, was introduced in evidence by the plaintiffs, heirs of Thomas J. Wilson, in rebuttal of the defendants' evidence. The defendants therefore asked for and were granted a reopening of the case, in order that they might prove that James B. Terry did not pay or intend to pay the taxes for 1899 on the 80 acres described as the W½ of SE¼ of Section 11, (in which he had no interest whatever), but intended to pay and did pay the taxes on the 80 acres described as the W½ of SE¼ of Section 3 (which 80 acres belonged to James B. Terry). On the reopening of the case the defendants proved beyond all doubt that James B. Terry, in paying his taxes on December 1, 1899, intended the payment to cover the taxes on the W½ of SE¼ of Section 3, but not to cover the taxes on the W½ of SE¼ of Section 11 (in which he had no interest); and that by an error of the assessor the W½ of SE¼ of Section 3 was described as the W½ of SE¼ of Section 11; in consequence of which error, the amount of the taxes paid by James B. Terry on the W½ of SE¼ of Section 3 was credited to the W½ of SE¼ of Section 11, (which Terry never owned). This erroneous description in the assessment of James B. Terry's W½ of SE¼ of Section 3, caused a dual assessment of the SW¼ of SE¼ of Section 11, because, of course, the southern half of the W½ overlaps the western half of the S½ of the quarter-section. But, as we have pointed out, ever since Section 11 of Article 10 of the Constitution of 1921 has been in effect, the only cause for which a tax sale is subject to annulment after three years from the date of the recording of the tax deed is that the taxes were paid before the sale was made. The fact that there was a dual assessment of the property is a matter of no consequence if the taxes were not paid. In this case the taxes for which the property was sold in 1900 were not paid on that part of the property described as the SW¼ of SE¼ of Section 11, but were paid by James B. Terry on his W½ of SE¼ of Section 3, notwithstanding the error in the assessment of the land of James B. Terry makes it seem as if he paid the taxes on the 80 acres described as W½ of SE¼ of Section 11 (belonging to somebody else), and neglected to pay the taxes on his own W½ of SE¼ of Section 3. James B. Terry owned and resided upon and cultivated a farm called the Barnett place, half a mile north from the S½ of SE¼ of Section 11, from 1890 to 1916. He died on the place in 1916. His land was described in his deed—and described correctly—as the S½ of N½ of SW¼, S½ of SW¼, and SW¼ of SE¼ of Section 2, and NW¼ of NW¼ of Section 11, and the W½ of SE¼ of Section 3, all in T. 23 N., R. 16 W. In the assessment of this land to James B. Terry in 1899, the assessor made the mistake of describing the W½ of SE¼ of Section 3 as the W½ of S E¼ of Section 11. A son and a daughter of James B. Terry testified that he never possessed or had anything to do with the W½ of SE¼ of Section 11, that his residence was on the land in Section 2, which land extended over the NW¼ of NW¼ of Section 11, and that he always paid his taxes

promptly on the land that he owned. A witness who examined the conveyance records testified that there was no record of James B. Terry's ever owning the W½ of SE¼ of Section 11, or of his ever being divested of his title to the W½ of SE¼ of Section 3, up to and far beyond the year 1900.

The plaintiffs in this case cite and rely upon the decisions which maintain that a sale of property for taxes which have been paid is absolutely null, and not protected by the limitation of three years, no matter who paid the taxes, viz.: Wilbert v. Michel, 42 La.Ann. 853, 8 So. 607; Lefebre v. Negrotto, 44 La.Ann. 792, 11 So. 91; Mrs. C. Brown v. Pontchartrain Land Co., 48 La.Ann. 1188, 20 So. 711; Kellogg v. McFatter, 111 La. 1037, 36 So. 112; Booksh v. A. Wilbert Sons Lumber & Shingle Co., 115 La. 351, 39 So. 9; Mecom v. Graves, 148 La. 369, 86 So. 917. In every one of these cases the party who paid the taxes, for which the property was afterwards sold, paid with the intention of paying the taxes on that identical property, and not by accident, or in consequence of an error of the assessor in describing the property assessed to the taxpayer. In fact it appears in the report of every one of these cases that the taxes for which the property was sold were paid by the owner of the property, except in the case of Mecom v. Graves, where the report does not disclose whether the taxpayer was or was not the owner of the property. In Lefebre v. Negrotto, where Lefebre bought a piece of property after it was assessed to the seller for the taxes of the current year, and, by an error of the tax collector, the

amount of the taxes which Lefebre paid on the property was credited to the property of another, the court said: "The taxpayer cannot be held responsible for the errors of the tax collector who credits the payment of the tax to another piece of property, owned by another person." In the case of Bernstine v. Leeper, 118 La. 1098, 43 So. 889, and again in the case of Page v. Kidd, 121 La. 1, 46 So. 35, where the taxpayer believed that the taxes which he paid were assessed against his property, and where, therefore, he intended the payment to be applied to the taxes on his property, but, on account of an error in the description of the property assessed, the payment was applied to the taxes on the property of another party, it was held that the taxes were actually paid on the property of the taxpayer, and not on the property described in the assessment, but belonging to the other party. In Page v. Kidd, Mrs. Chaffraix, an intervener in the suit, owned a tract of land in Section 24, but by an error of the assessor, the land assessed to her was described as being in Section 29, and, in consequence of the error, the taxes which she paid were credited to the land in Section 29, belonging to another party. It was held that, in reality, the taxes paid by Mrs. Chaffraix were paid on her land in Section 24, and not on the land of the other party, in Section 29. Chief Justice Breaux, for the court, said: "She certainly did pay taxes on certain land, but it happened that she paid them for land in section 29, in which she owned no land, and she did not pay on section 24, in which she did own land.

It was a clerical error of the assessor. * * * She should not be prejudiced in her rights by the failure of the assessor to perform his duty." The Court of Appeal for the Parish of Orleans adopted and followed the doctrine of that decision and of the decision in Bernstine v. Leeper, in the case of Purcell v. Seeger, 10 Orleans App. 308, and on rehearing 11 Orleans App. 17; and the decision of the Court of Appeal was approved by this court by its refusal to grant a writ of review. In that case, two tracts of land, of like dimensions, but on opposite sides of the road, were, by an error of the assessor, so assessed that the land assessed to one of the taxpayers bore the description of the land of the other, and vice versa. The owner of one of the tracts of land paid his taxes, but, by the failure of the other to pay his taxes, the land of the one who had paid was sold for delinquent taxes. In deciding that the taxes, in reality, were paid on the land of the one who paid, the court said:

"If it can be said that by *failing to pay* the taxes under a certain assessment made in his name, a person has failed to pay the taxes due on a certain piece of property belonging to him, it is quite certain that by *paying* the taxes so assessed, he has paid the taxes due upon the identical property and no other."

Our conclusion is that the payment of the taxes for 1899 by James B. Terry was not in reality a payment of the taxes on the W½ of SE¼ of Section 11, T. 23 N., R. 16 W., but was a payment of

the taxes on the corresponding 80 acres in Section 3, of that township.

If for any reason the tax sale to Noah Tyson in 1900 did not convey a valid title for the half interest in the S½ of SE¼ of Section 11 and the N½ of NE¼ of Section 14, the tax sale to Noah Tyson in 1911 conveyed the title for the half interest in that tract, as well as in the adjoining 80 acres forming the W½ of NW¼ of Section 13. Inasmuch as the tax deed in 1900 did not appear on its face to transfer the title for any part of the 240 acres of land, in which Wilson had owned a half interest, he remained on record as the owner of the half interest in the land. Therefore, by the terms of Act No. 140 of 1890, it was the duty of the assessor to assess the half interest in the land to Wilson. It seems that the assessor did not discover until 1910 that the title remained of record in Wilson's name. In making the assessment of the half interest in the land to Wilson, in 1910, the assessor described it thus: "120 acres—½ interest in S½ of SE¼ of Sec. 13, and N½ of NE¼ of Sec. 14, and in W½ of NW¼ of Sec. 13, Township 23, Range 16." The only error made in this description of the land was that the S½ of SE¼ of Section 11 was called the S½ of SE¼ of Section 13. The same mistake was made in the tax deed, where the property is described thus: "One half interest in and to the south half of southeast quarter of Section 13 and in north half of northeast quarter of Section 14 and West half of northwest quarter of Section 13, Township 23, Range 16." Wilson had never

had any interest in the 80 acres forming the S½ of SE¼ of Section 13, which is apart from the 160 acres forming the W½ of NW¼ of Section 13 and N½ of NE¼ of Section 14, and correctly described in the assessment and in the tax deed. There is no doubt that the figure "13", first appearing in the assessment and in the tax deed, was intended for the figure "11", and hence there is no doubt that the 240 acres of land intended to be described in the assessment is the land in contest in this suit. In the case of Vannetta v. Busbey, 131 La. 681, 60 So. 76, a tax sale of a quarter-section of land described in the assessment and in the tax deed as being in Township 8 was held to be a valid sale of the corresponding quarter-section in Township 9. In Hollingsworth v. Poindexter, 156 La. 621, 100 So. 790, where, in the assessment to Hollingsworth, and in the tax sale, of 560 acres of land in Section 16, the 80 acres forming the W½ of NE¼, which belonged to Hollingsworth, was omitted, and the 80 acres forming the W½ of NW¼, which did not belong to Hollingsworth, was included, the tax sale was held to be a valid sale of the W½ of NE¼, belonging to Hollingsworth. In the case of Gayle v. Slicer, 188 La. 940, 178 So. 498, a tax sale of 80 acres of land described in the assessment as the E½ of SW¼ of Sec. 8, T. 17, R. 11, was held to be a valid sale of the E½ of NE¼ of the section, after the lapse of three years from the date of the recording of the tax deed. According to these decisions, and the others which we have cited, the tax sale to Noah Tyson in 1911 was a valid sale

of the S½ of SE¼ of Section 11, after the lapse of three years from the date of the recording of the tax deed.

The plaintiffs contend that the taxes were paid under a dual assessment on the half interest in the S.½ of S.E.¼ of Section 11 and N.½ of N.E.¼ of Section 14, in the year 1910, and hence that the tax sale to Noah Tyson in 1911 was null to that extent. That complaint, if well founded, does not affect the validity of the tax title which Noah Tyson acquired for the half interest in the W.½ of N.W.¼ of Section 13,—which, as we have shown, was not included in the tax sale to Noah Tyson in 1900. And, if the complaint is well founded, the defendants, of course, fall back upon the tax sale to Noah Tyson in 1900 for a valid title to the S.½ of S.E.¼ of Section 11 and N.½ of N.E.¼ of Section 14. The facts concerning the alleged dual assessment of the half interest in the latter tract, in 1910, are as follows: The tax rolls for that year show that Noah Tyson was assessed for a fourth interest, and that N. L. Tyson [Nancy Lilla Tyson] was assessed also for a fourth interest, in the 240 acres of land now in contest, and that the taxes were paid under both assessments on March 2, 1911. The tax rolls for that year show also that S. M. Tyson was assessed for a half interest in the S.½ of S.E.¼ of Section 11 and N.½ of N.E.¼ of Section 14, and that the taxes so assessed were paid on February 6, 1911. It appears, therefore, that all of the taxes on the S.½ of S.E.¼ of Section 11 and N.½ of N.E.¼ of Section 14, for the year 1910, were paid before the date of the tax sale to Noah Tyson. But

it appears also that the only land that S. M. Tyson then owned, or had ever owned, was the adjacent 80-acre tract, described as the N.E.¼ of N.W.¼ and N.W.¼ of N.E.¼ of Section 13. S. M. Tyson had never owned the half interest—or any interest—in the 160 acres assessed to him in 1910. In that year and for several years before, S. M. Tyson was residing upon and cultivating the adjacent 80 acres which he owned, but which was not assessed to him in 1910. The tax receipt which he received when he paid his taxes for that year did not bear a description of the property on which he paid the taxes. The receipt was found among the other receipts for the taxes which N. S. Tyson had paid every year, from 1899 to 1910. According to the decisions which we have cited in discussing the payment of taxes by James B. Terry in 1899, the taxes which N. S. Tyson paid in 1910 should have been credited to the 80 acres of land which he owned, instead of being credited to the half of the 160 acres, in which he had no interest.

The plea of the Wilson heirs that their father had a verbal agreement with Noah Tyson which obliged Tyson to pay the taxes on Wilson's half interest in the property, and which therefore forbade Tyson to allow Wilson's interest in the property to be sold for taxes, depends upon the testimony of two witnesses. They testified that they were present during a conversation between Noah Tyson and Thomas J. Wilson, on a street corner in Atlanta, Texas, two or three days before the date on which the tax sale of the half interest of the Taylor Manufacturing Company in

the 240 acres of land of the estate of Spearman was to be made. The tax deed shows that the sale was made to Wilson on May 3d, 1890, although the deed was not signed by the tax collector until September 27th, 1890. The date of the conversation, therefore, according to the testimony of the two witnesses, was in the latter part of April or on the first day of May, 1890; that is, 46 years before the witnesses gave their testimony. The testimony was objected to on the ground that testimony concerning a verbal agreement is not admissible for the purpose of depriving a person of his title to real estate, and on the further ground that the limitation of three years is a bar against such an attack upon the validity of a tax sale. Assuming, for the sake of argument only, that the testimony was admissible, it would not justify an annulment of the defendants' tax title. The agreement which the witnesses undertook to prove was that Noah Tyson induced Wilson to buy the half interest in the 240 acres of land, in 1890, on the promise, on the part of Tyson, that he would continue to reside upon and cultivate the property, and pay all of the expenses, including all future taxes on the whole tract, and would divide the profits with Wilson, if he, Tyson, made any profit. Tyson and his wife and children were already in possession of the property, by virtue of Mrs. Tyson's inheritance, and they were clearing and cultivating the land for their own account. Hence it is not likely that Tyson would have made the bargain which the two witnesses thought he made, with Wilson or with any one else. The amount of the taxes for which the half interest in the land was assessed

to the Taylor Manufacturing Company was only $10.65; the accrued interest amounted to $4.90 on the date of the sale; and the costs amounted to $8.95; making a total sum of only $24.50, for which Wilson bought the half interest in the property at the tax sale. One of the two witnesses, who testified that he heard the conversation between Noah Tyson and Thomas J. Wilson, said that he, the witness, and Wilson were standing on a street corner, in Atlanta, Texas, when Noah Tyson, in company with a boy, came up and said to Wilson that he had been looking for him, that he had come from his home to Atlanta to tell Wilson that the half interest of the Taylor Manufacturing Company in the Spearman property was advertised to be sold for taxes on the next Saturday, and to request him, Wilson, to buy the half interest at the tax sale. The witness said that Tyson then made the proposition that if Wilson would buy the half interest in the property at the tax sale he, Tyson, would continue to take care of and cultivate the place, and pay all expenses, including all future taxes on the property, and would divide with Wilson whatever profit he might make. The witness said that Wilson accepted Tyson's proposition. The witness was asked by one of the attorneys for the plaintiffs what reason Tyson gave for making the proposition to Wilson, and the witness replied that the only reason that Tyson gave Wilson for making the proposition was that, on account of his (Tyson's) friendly interest in him (Wilson), "he [Tyson] would rather Wilson would have it [the half interest in the property] than anybody else." The attorney then asked the witness if Tyson said anything about keeping the property in the Spearman family, and the witness replied that he did not remember any such remark. The witness said that he was not at that time acquainted with the boy who accompanied Tyson on the occasion of the conversation with Wilson in Atlanta, Texas; that Tyson and the boy rode on their horses to Atlanta; that the boy returned to Rodessa that evening, and Tyson remained at Wilson's home all night. The boy referred to was the other witness whom the plaintiffs produced. He testified that, in the conversation referred to, Tyson merely told Wilson that the old Spearman place was about to be sold for taxes, and asked Wilson to pay the taxes; and that Wilson agreed to pay the taxes. The witness testified that, on a subsequent occasion, "Mr. Wilson told Mr. Tyson to work the property, live on it, pay the taxes and all expenses and upkeep, and if anything was left they would divide it." The witness said that Tyson "said that he would." On cross-examination, the witness said that he could not remember whether the time which elapsed between the first conversation and the subsequent conversation, which he referred to, between Wilson and Tyson, was more or less than one month, or was more or less than five years, but that he was sure it was less than ten years. The witness was only fifteen years old when the verbal agreement between Tyson and Wilson is supposed to have been made. Neither of the two witnesses was in any way concerned with any verbal agreement that might have been made between Tyson and Wilson; hence their recollection of any such verbal agreement, after the lapse of

forty-six years, would not be reliable enough to upset titles to real estate—if such testimony should be deemed admissible at all for that purpose. Thomas J. Wilson died on January 15, 1922, and Noah Tyson died on November 10, 1923. Wilson, therefore, lived nearly 32 years after the tax sale was made to him, nearly 22 years after the first tax sale was made to Tyson, and nearly 11 years after the second tax sale was made to Tyson, and never sued to set aside the tax sales to Tyson, who was in possession of the property during all of those years. Our conclusion is that this complaint about the tax sales to Noah Tyson is not well founded.

 Inasmuch as we have decided that the defendants' tax titles are valid, they have no need for the plea of prescription of ten years, in so far as the half interest in the 160 acres forming the W½ of NW¼ of Section 13 and N½ of NE¼ of Section 14 is concerned. That tract of land was described correctly in the tax sale in 1911; hence, as Noah Tyson and his family were in actual possession as joint owners of the whole tract of land, for a period exceeding ten years, the plea of prescription perhaps would be good, if necessary. A tax title may serve as the basis for a plea of prescription of ten years acquirendi causa. Hickey v. Smith, 118 La. 169, 42 So. 762.

The defendants' plea that their tax title for a half interest in the property reduces the claims of the plaintiffs one-half is applicable now only to the claim of the minor child, Velma Allene Lowery, because we have concluded that the demands of all other plaintiffs in these suits must be re-

jected. The tax sale to Thomas J. Wilson, in 1890, of the half interest assessed to the Taylor Manufacturing Company, in the 240 acres of land, conveyed a valid title for a half interest in the land, certainly after three years from the date of the recording of the tax deed, because the assessment was made in the name of the record owner of a half interest in the property, although in fact this record owner had a good title for only $\frac{7}{16}$ interest in the property. The interest which the Taylor Manufacturing Company acquired from William B. Spearman consisted of the $\frac{3}{16}$ interest which he had bought from Mrs. Fannie Spearman Smith, the $\frac{3}{16}$ interest which he had bought from Mrs. Elizabeth Spearman Matthews, and the $\frac{1}{16}$ interest which he had inherited from his father. The other Spearman heirs, therefore, lost, in proportion to their interests in the estate, the extra $\frac{1}{16}$ interest which was sold for taxes assessed in the name of the record owner of a half interest in the property. Accordingly, the claim of Miss Velma Allene Lowery is subject to the reduction of $\frac{1}{16}$ thereof, by reason of the defendants' tax title. Her interest in the Lawton 20 acres, being the N½ of NW¼ of NW¼ of Section 13, is reduced from $\frac{1}{336}$ interest to $\frac{5}{1792}$ interest; and her interest in the 60 acres described as the S½ of NW¼ of NW¼ and all of the SW¼ of NW¼ of Section 13 is reduced from $\frac{1}{224}$ interest to $\frac{15}{3584}$ interest.

 The defendants in the case entitled Lelia Spearman Buchanan et al. v. Minnie Tyson Fuller et al. are liable for the court costs incurred in that case; and the plaintiffs in each of the other cases are liable

for the costs incurred in each case. But, because the cases were consolidated and tried as one case, it is impossible to separate the costs incurred in one case from the costs incurred in another. Hence we shall apportion the liability for costs according to the number of suits; and, in doing this, we shall treat the two suits of the heirs ·of Thomas J. Wilson as one suit, because the costs incurred in them would have been the same if the plaintiffs had filed only one suit against all of the defendants.

### Decree.

The judgment appealed from in the suit entitled Lelia S. Buchanan et al. v. Minnie Tyson Fuller et al. is amended so that the minor child, Velma Allene Lowery, represented by her tutrix, Mrs. Lelia Spearman Buchanan, is now declared to be the owner of ⁵⁄₁₇₉₂ interest in the 20 acres of land described as N½ of NW¼ of NW¼ of Section 13, T. 23 N., R. 16 W., and is declared to be the owner of ¹⁵⁄₃₅₈₄ interest in the 60 acres of land described as the S½ of NW¼ of NW¼ and all of the SW¼ of NW¼ of Section 13, T. 23 N., R. 16 W. As thus amended the judgment in favor of the minor child, Velma Allene Lowery, is affirmed. The judgments appealed from are affirmed in so far as they reject the demands of all other plaintiffs in these consolidated suits. The defendants, Minnie Tyson Fuller, John Tyson, J. N. Peak, Inc., and the executors of the Estate of N. S. Tyson, deceased, are to pay one-fifth of all of the costs of these consolidated suits; Mrs. Pearl Smith Tillery is to pay one-fifth of the costs; the plaintiffs in · the suit entitled W. R. Spearman et al. v.

J. N. Peak, Inc., et al. are to pay one-fifth of the costs; the plaintiffs in the suit entitled Ralph Thatcher Wilson et al. v. N. S. Tyson et al., and in the suit entitled Ralph Thatcher Wilson et al. v. J. N. Peak, Inc., et al. are to pay one-fifth of the costs; and the plaintiffs in the suit entitled Noah S. Carter et al. v. Minnie Tyson Fuller et al. are to pay one-fifth of the costs.

### On Applications for Rehearing.

### PER CURIAM.

In their applications for a rehearing, Mrs. Pearl Smith Tillery and Mrs. Lelia Spearman Buchanan, for herself and as tutrix for the minor child, Velma Allene Lowery, contend that the judgment rendered against them, sustaining the plea of prescription of thirty years under article 1030 of the Civil Code, is not consistent with the provisions of articles 352 and 977 of the Civil Code. The latter articles declare that it is not necessary for a minor heir to make a formal acceptance of a succession, because the acceptance is considered as made for the minor, with benefit of inventory, by mere operation of law, and has the same effect that a formal acceptance has. These articles, when read in connection with article 1030 of the Civil Code, mean merely that the law protects the minor heir, during his or her minority, against the consequence of a failure to formally accept the succession. But, when the minor arrives at the age of majority, he has only thirty years from that time in which to accept the succession, or his failure to accept will inure to the benefit of any coheir or coheirs who may have

accepted, or of any heir next in degree who may have accepted, by going into possession of the estate. If this were not true, the right of an heir who is a minor at the time when the succession falls to him, to elect whether to accept or to renounce the succession, would never prescribe, even though a major coheir has accepted the succession by going into possession of the estate. We adhere to our opinion that the prescription of thirty years against the right of an heir to elect whether to accept or renounce a succession is only suspended during the minority of the heir, and commences to accrue when the minor reaches the age of majority. Article 1007 of the Civil Code, which provides that, if a person who is entitled to an inheritance dies before having expressly or tacitly accepted or rejected it, his heir shall have the right to accept it under him, is not in conflict with our opinion that the prescription of thirty years against the right of an heir to elect whether he will accept or reject the succession is only suspended during the minority of the heir, if the heir be a minor at the time when he becomes an heir.

Mrs. Lelia Spearman Buchanan, as tutrix for the minor child, Velma Allene Lowery, claims that the child is entitled to share with Mrs. Nancy Lilla Tyson the benefit of the prescription of thirty years, which bars the right of action of all of the Spearman heirs except Mrs. Tyson. In the original opinion which we rendered in this case we observed that the prescription of thirty years against the right of a regular heir to accept a succession inures to the benefit only of a coheir who has accepted, or of an heir next in degree who has accepted the succession. Velma Allene Lowery was not a coheir with Mrs. Tyson. In fact Velma Allene Lowery is not an heir at all of Samuel W. Spearman, or of Dempsey Susan Spearman, or of Lucy Spearman Wilson. Velma Allene Lowery's grandfather, Travis H. Spearman, was the heir of Samuel W. Spearman and Dempsey Susan Spearman, and of Lucy Spearman Wilson. When Travis H. Spearman died, on March 24, 1894, he transmitted to his two daughters, Mrs. Buchanan and Mrs. Lowery, his interest in the succession of his father and mother, and of his sister, Lucy, with such right as he had to accept their successions. When Mrs. Lowery died, February 11, 1935, she transmitted to her daughter, Velma Allene Lowery, such right as she, Mrs. Lowery, had, to accept the succession of her father, Travis H. Spearman, and of his parents, Samuel W. Spearman and Dempsey Susan Spearman, and of his sister, Lucy Spearman Wilson. Velma Allene Lowery is the heir only of her mother, Mrs. Velma Spearman Lowery. All of this is explained in the Succession of Coco, 185 La. 901, 913, 171 So. 70, 74, construing article 944 of the Civil Code. Article 1022 of the Civil Code declares that the interest of an heir who renounces the succession goes to his coheirs of the same degree, or, if he has no coheirs of the same degree, to the heirs in the next degree. Applying that article to the case where an heir, instead of renouncing the succession, allows the thirty years prescription to bar his right to claim the

succession from a coheir who has accepted, the article has no application to the case of Velma Allene Lowery, because she was not a coheir with Nancy Spearman Tyson, or an heir in the next degree. For the same reason, article 1026 of the Civil Code, which provides that accretion is for the benefit of the coheirs who have accepted, or who may accept, applicable to the case of Velma Allene Lowery. And, for the same reason, article 1027 of the Civil Code is not applicable to the case of Velma Allene Lowery. This article declares that the heirs to whom an interest in the succession comes by the renunciation of their coheirs, take it in the same proportion that they take the inheritance. We must bear in mind that the successions from which came all of the inherited interests in these suits were the Successions of Samuel W. Spearman and Dempsey Susan Spearman, and from them the Succession of Lucy Spearman Wilson. Velma Allene Lowery is not an heir of any of them.

Petitions for a rehearing were filed also by the heirs of George R. Spearman, and by the heirs of Thomas J. Wilson; but the contentions made in these petitions for a rehearing were answered completely in the original opinion rendered in this case.

With this explanation all of the applications for a rehearing are denied.

## On Application to Correct a Clerical Error in the Decree.

The attorneys representing Mrs. Lelia Spearman Buchanan, tutrix for the minor child, Velma Allene Lowery, have called our attention to a clerical error, which is a very obvious error, in the decree which we rendered in this case. And they ask for a correction of the error. As we explained on pages 699 and 700 of the opinion which we rendered, we reduced the interest which the judge of the district court had allowed the minor child, Velma Allene Lowery, to 5/1792 interest in the 20 acres of land described as N½ of NW¼ of NW¼ of Section 13, in T. 23 N., R. 16 W., and to 15/3584 interest in the remaining 220 acres of land in contest. But, in the decree which we rendered, the remaining 220 acres of land in contest was described erroneously as being only the S½ of NW¼ of NW¼ and all of the SW¼ of NW¼ of Section 13, in T. 23 N., R. 16 W.

The attorneys for the defendants in this case, in response to the motion of Mrs. Lelia Spearman Buchanan, tutrix, to correct the error which we have explained, have filed an admission that the error in the decree is merely a clerical error, and that it ought to be corrected by a decree of this court.

It is therefore ordered that the clerical error in the decree heretofore rendered in this case shall be and it is hereby corrected so that the minor child, Velma Allene Lowery, is declared to be the owner of 5/1792 interest in the 20 acres of land forming the N½ of NW¼ of NW¼ of Section 13, in T. 23 N., R. 16 W., and of 15/3584 interest in the remaining 220 acres of land in dispute, being the 60 acres forming the S½ of NW¼ of NW¼ and all of the SW¼ of NW¼ of Section 13, and the 80 acres

forming the S½ of SE¼ of Section 11, and the 80 acres forming the N½ of NE¼ of Section 14, all in T. 23 N., R. 16 W., in Caddo Parish, Louisiana.